DECISION
Before the Court, pursuant to Rule 12(b)(6) of the Superior Court Rules of Civil Procedure, are defendants' motions to dismiss and the plaintiff's objection thereto.
 Facts/Travel
On October 12, 1999, the Attorney General of the State of Rhode Island (the Attorney General or the State) filed a complaint against several lead pigment manufacturers and their trade association, specifically nine named defendants[1] and John Doe Corporations collectively identified herein as the lead[2] industry. In its complaint, the State alleges an extensive history of defendants' conduct consisting of misrepresentations and concealment of evidence regarding the hazards of lead. The State claims that it has been damaged because it has incurred, and continues to incur, substantial costs related to discovering and abating lead, detecting lead poisoning, and providing (i) medical and/or other care for lead-poisoned residents of this state, (ii) education programs for children suffering injuries as a result of lead exposure and (iii) education programs for state residents.[3] In seeking compensatory and punitive damages, injunctive and other equitable relief, the State pled ten causes of action: (i) public nuisance, (ii) violation of the Rhode Island Unfair Trade Practice and Consumer Protection Act, G.L. 1956 § 6-13.1-1 et seq. (UTPA), (iii) strict liability, (iv) negligence, (v) negligent misrepresentations and omissions, (vi) fraudulent misrepresentations and omissions, (vii) civil conspiracy, (viii) unjust enrichment, (ix) indemnity and (x) equitable relief to protect children.
Certain defendants filed their motion to dismiss on January 31, 2000. On the same date, defendant The Sherwin-Williams Company (Sherwin-Williams) filed a motion to dismiss the complaint on constitutional grounds. On May 31, 2000, defendant Lead Industries Association (LIA) filed a motion to dismiss wherein it joined Sherwin-Williams' argument to dismiss based on constitutional grounds. In early June, the State filed briefs in opposition to the defendants' motions filed on January 31, 2000, to which Sherwin-Williams, the LIA and certain defendants filed reply briefs on August 15, 2000. On July 21, 2000, the State filed its first amended complaint wherein it merely added ConAgra as a defendant.[4] Defendant ConAgra filed its motion to dismiss on September 15, 2000. On October 12, 2000, the Court heard extensive oral argument on the motions to dismiss and the State's objection thereto. Subsequent to the availability of a transcript of the hearing, the parties simultaneously filed post-hearing briefs on or about December 14, 2000.
Relying on various theories and over the State's objection, the defendants move this Court pursuant to Rule 12(b)(6) of the Superior Court Rules of Civil Procedure to dismiss for failure to state any cause of action cognizable under Rhode Island law.
 Motion to Dismiss
It is well-settled that the sole function of a motion to dismiss is to test the sufficiency of the complaint. Rhode Island Affiliate, American Civil Liberties Union, Inc. v. Bernasconi, 557 A.2d 1232, 1232 (R.I. 1989). "When ruling on a Rule 12(b)(6) motion, the trial justice must look no further than the complaint, assume that all allegations in the complaint are true, and resolve any doubts in a plaintiff's favor." Estate of Sherman v. Almeida, 747 A.2d 470, 473 (R.I. 2000) (quoting Rhode Island Affiliate, American Civil Liberties Union, Inc., 557 A.2d at 1232). "When it appears clear beyond a reasonable doubt that plaintiff would not be entitled to relief under any set of facts, a motion made pursuant to Rule 12(b)(6) should be granted." Solomon v. Progressive Casualty Insurance Co., 685 A.2d 1073, 1074 (R.I. 1996) (order) (citing Ellis v. Rhode Island Public Transit Authority, 586 A.2d 1055, 1057 (R.I. 1991)).
 Attorney General's Capacity to Bring this Suit
At the outset, the defendants challenge the Attorney General's authority in bringing this suit on behalf of the State. The Attorney General counters that his authority derives from the following three distinct capacities: (1) proprietary, as the State's corporate attorney; (2) statutory, as provided for in the Rhode Island General Laws; and (3) sovereign, as founded in the common law and established in the Rhode Island Constitution. The State contends that this suit differs in kind from other suits commenced by private individual plaintiffs. Regarding the Attorney General's authority to bring this action, the defendants primarily challenge the extent of his sovereign capacity to pursue certain claims on behalf of the Rhode Island citizenry.
In this state it is well-settled that "[s]uits for the public should be placed in public and responsible hands." McCarthy v. McAloon, 79 R.I. 55, 62, 83 A.2d 75, 78 (1951) (quoting O'Brien v. Board of Aldermen,18 R.I. 113, 116, 25 A. 914, 915 (1892)). The public officer vested with that authority is the Attorney General of the state. Id.; see also Stearns v. Newport Hospital, 27 R.I. 309, 316, 62 A. 132, 135 (1905) (Recognizing that the Attorney General is the proper person to represent the public in any judicial inquiry regarding the conduct of the trustee in administering a public trust, our Supreme Court quoted Burbank v. Burbank, 152 Mass. 254, 25 N.E. 427 (1890), "`This duty of maintaining the rights of the public is vested in the Commonwealth, and it is exercised here, as in England, by the attorney-general.'") Although exclusive, the Attorney General's authority to redress a purely public wrong excepts "those instances where one of the public who is injured has a distinct personal legal interest different from that of the public at large." McCarthy, 79 R.I. at 62, 83 A.2d at 78.
The significant powers of the office of Attorney General derive from common and statutory law. "`The office of Attorney General is an ancient one. It came into being as a necessary adjunct in the administration of the common law of England and was transported to America in the early days of the establishment of government in the colonies as part of their English derived common law.'" Suitor v. Nugent, 98 R.I. 56, 58,199 A.2d 722 (R.I. 1964) (quoting Commonwealth ex re. Minerd v. Margiotti, 325 Pa. 17, 21, 188 A. 524 (1936)). Our Supreme Court recognized, as the Pennsylvania court had noted, that with the office of Attorney General "came the common-law powers and duties thereof to the extent that they were not abridged by constitutional provision." Id. Our constitution "did not purport to create such an office but recognized it as existing and provided for continuance of the powers and duties exercised by its occupant prior to the adoption of the constitution." Id. Specifically, Article IX, section 12 of our constitution provides, "The duties and powers of the . . . attorney-general . . . shall be the same under this constitution as are now established, or as from time to time may be prescribed by law." Accordingly, the common law powers of the Attorney General are not abridged by the Rhode Island Constitution. Further, the Legislature may not "infringe upon the fundamental powers of the Attorney General." In Re House of Representatives, 575 A.2d 176, 180 (R.I. 1990) (construing Murphy v. Yates, 276 Md. 475, 492, 494,348 A.2d 837, 846-47 (1975)) ("the General Assembly may not abrogate the common law powers of the Attorney General . . . having been stated as those `prescribed by law'. . . . If an Office is created by the Constitution . . . the position can neither be abolished by statute nor reduced to impotence by the transfer of duties characteristic of the office to another office created by the legislature"). Additionally, the powers of the Attorney General derive from certain statutory authority, including G.L. 1956 §§ 42-9-2, 42-9-5, and 6-13.1-5 (infra). Specifically, in relevant part, G.L. 1956 § 42-9-2 provides that, "The attorney general . . . shall exercise the powers and duties prescribed in and shall enforce the provisions of this chapter and of §§ 12-1-4
— 12-1-12 [Title 12 Criminal Procedure], and in all other provisions of the general laws and public laws insofar as they relate to the powers and duties of the attorney general." Further, G.L. 1956 § 42-9-5 provides, "The attorney general shall commence and prosecute to final judgment and execution those other legal or equitable processes, and shall perform those other duties which are or may be required of him or her by law." Accordingly, the Attorney General's authority in bringing this action is comprised of that which existed at common law, as well as that allowed by statute.
 The Doctrine of Parens Patriae
A state's authority to vindicate certain interests of the state and its citizens is often referred to as a parens patriae action. "Parens patriae means literally `parent of the country.'" Estados Unidos Mexicanos v. DeCoster, 229 F.3d 332, 335 (1st Cir. Me 2000) (quoting Alfred L. Snapp Son, Inc. v. Puerto Rico, 458 U.S. 592, 600, 102 S.Ct. 3260, 73 L.Ed.2d 995 (1982)). The doctrine "creates an exception to normal rules of standing applied to private citizens in recognition of the special role that a State plays in pursuing its quasi-sovereign interests in `the well-being of its populace.'" Id. (citing Snapp, 458 U.S. at 602); see also Georgia v. Tennessee Copper Co., 206 U.S. 230, 237, 27 S.Ct. 618, 51 L.Ed. 1038 (1907) (a state "has an interest independent of and behind all titles of its citizens, in all the earth and air within its domain"). A state's "quasi-sovereign interest is thus distinct from, for example, its sovereign interest in protecting and maintaining its boundaries and its proprietary interest in owning land or conducting a business venture." Id. at n. 3 (citing Snapp, 458 U.S. at 601-02). It is a "judicially created exception that has been narrowly construed." Id. In DeCoster, the First Circuit Court of Appeals recognized that the "most complete explanation of the parens patriae doctrine in its modern incarnation, as applied to the States of this country," appears in the United States Supreme Court's opinion in Snapp:
 "In order to maintain [a parens patriae] action, the State must articulate an interest apart from the interests of particular private parties, i.e., the State must be more than a nominal party. The State must express a quasi-sovereign interest. Although the articulation of such interests is a matter for case-by-case development — neither an exhaustive formal definition nor a definitive list of qualifying interests can be presented in the abstract — certain characteristics of such interests are so far evident. These characteristics fall into two general categories. First, a State has a quasi-sovereign interest in the health and well-being — both physical and economic — of its residents in general. Second, a State has a quasi-sovereign interest in not being discriminatorily denied its rightful status within the federal system." Id. at 336 (quoting Snapp, 458 U.S. at 607).
Finally, a quasi-sovereign interest "must be sufficiently concrete to create an actual controversy between the State and the defendant." Snapp, 458 U.S. at 602. Sufficient quasi-sovereign interests include a state's interests in its citizens' health, safety, and welfare as well as in a healthful environment. Id. at 603-07.
Rhode Island recognizes the parens patriae doctrine.[5] Further, if the Attorney General could not bring such actions, it appears that wrongs to the public interest would not be able to be vindicated by the State.
 Separation of Powers
The defendants characterize the instant action as an attempt by the State to have the judiciary exercise legislative function by setting the State's fiscal and regulatory policy in violation of separation of powers principles. Without citing controlling caselaw, they contend that, absent legislative authorization, the State cannot by this action recover costs for lead inspections and abatement, public health education, medical care and special education of lead-affected children. Specifically, the defendants contend that besides not imposing any obligation or responsibility on lead pigment manufacturers, the Lead Poisoning Prevention Act, G.L. 1956 § 23-24.6-1 et seq., enacted in 1991 (LPPA), as a comprehensive enactment, does not provide any right of action which allows the state to recover its costs. The defendants contend that the Rhode Island Constitution "entrusts the powers for setting fiscal and regulatory policy to the legislature, not the judiciary acting at the behest of the Attorney General."[6]
Accordingly, the defendants contend, this Court should dismiss the entire action.
The Attorney General, relying on a liberal interpretation clause within the statute, counters that the LPPA does not contain any language suggesting that the General Assembly intended the statute to provide the exclusive mechanism to remedy Rhode Island's environmental health problem caused by lead. Specifically, section 25 of the LPPA, entitled "Interpretation and severability," provides in relevant part that "[t]he provisions of this chapter shall be liberally construed and shall be held to be in addition to, and not in substitution for or a limitation of, the provisions of any other law." G.L. § 23-24.6-25. It is well-settled that it is "the province and duty of the judicial department to say what the law is." City of Pawtucket v. Sundlun, 662 A.2d 40, 59 (R.I. 1995) (citing Marbury v. Madison, 5 U.S. 137, 177 2 L.Ed 60, 73 (1803)). Accordingly, "when the language of a legislative enactment is clear and unambiguous, th[e] [c]ourt will interpret the statute literally and accord the words of the statute their plain and ordinary meanings." Seddon v. Bonner, 755 A.2d 823, 826 (R.I. 2000) (citing Accent Store Design, Inc. v. Marathon House, Inc., 674 A.2d 1223, 1226 (R.I. 1996)). Furthermore, in examining an unambiguous statute, "there is no room for statutory construction"; it must be applied as written. Id. (citing In re Denisewich, 643 A.2d 1194, 1197 (R.I. 1994)). The General Assembly's inclusion of the liberal-interpretation clause supports the state's argument. Further, subsection 6 of the legislative findings codified in § 23-24.6-2 of the LPPA provides:
 "The enactment and enforcement of this chapter is essential to the public interest. It is intended that the provisions of this chapter be liberally construed to effectuate its purposes."
Moreover, the express purpose of the LPPA is "to protect the public health and the public interest by establishing a comprehensive program to reduce exposure to environmental lead and thereby prevent childhood lead poisoning, the most severe environmental health problem in Rhode Island." G.L. 1956 § 23-24.6.3. Accordingly, the absence of express authorization in the statute does not constitute a separation of powers bar which absolutely precludes the Attorney General from bringing this type of action. However, to the extent that the State seeks to defray lead-related special education costs, its claims fail entirely. City of Pawtucket, 662 A.2d at 57-59 ("the task of designing a system of financing public education has been delegated to the General Assembly under Article 12 [of the Rhode Island Constitution]"; the court may not meddle with "the plenary constitutional power of the General Assembly in education" nor assume "a responsibility explicitly committed to the Legislature").
 Free Public Services
While acknowledging that Rhode Island decisions have not addressed the free public services doctrine specifically, the defendants contend that the Court should apply the rule and hold that the costs of public services related to lead are not recoverable as a matter of law. The free public services doctrine generally provides that "public expenditures made in the performance of governmental functions are not recoverable." Koch v. Consolidated Edison Company of New York, Inc.,62 N.Y.2d 548, 468 N.E.2d 1, 8, 479 N.Y.S.2d 163 (1984), cert. denied,469 U.S. 1210, 105 S.Ct. 1177, 84 L.Ed.2d 326 (1985). "[C]ertain exceptions to the general rule have been created by statutory enactment to give a municipality a claim for expenditures for firefighters or other police power services." Id. The defendants argue that the free public services rule especially applies to this matter because it is consistent with separation of powers principles. The defendants essentially contend that this Court may not create a remedy.
Rule 12(b)(6) which controls this matter does not permit this Court to dismiss a case unless it fails to state a claim upon which relief can be granted. Super. Ct. R. of Civ. P. 12(b)(6). In reviewing a 12(b)(6) motion, as in all matters before it, this Court is constrained to follow existing Rhode Island law. See, e.g., Robinson v. Delfino, 710 A.2d 154, 161 (R.I. 1998) (Here our Supreme Court, though ultimately overturning the Superior Court, recognized that the trial justice "had correctly followed and applied the controlling Rhode Island case law existing at the time of the trial"). Indeed, "the creation of new causes of action should be left to the Legislature." Ferreira v. Strack, 652 A.2d 965, 968 (R.I. 1995) (citations omitted). However, this Court's recognition of the Attorney General's existing authority to protect the public interest is not, in this Court's opinion, creating a cause of action or judicial remedy.[7] Accordingly, the defendants' motions to dismiss must be examined in the context of the well-established powers of the Attorney General to redress public wrongs. To adopt the free public services rule and dismiss this action thereby, particularly in the absence of controlling caselaw requiring such a rule, would ignore existing authority of the Attorney General, as for example, with respect to his right to bring a public nuisance action.
 Count I — Public Nuisance
In Count I of its complaint, the State asserts that "the defendants created an environmental hazard that continues and will continue to unreasonably interfere with the health, safety, peace, comfort or convenience of the residents of the State, thereby constituting a public nuisance."[8] It is undisputed that the Attorney General may prosecute a public nuisance at common law and under General Laws 1956 § 10-1-1
et seq., entitled "Abatement of Nuisances." Section 10-1-1 provides:
 "Whenever a nuisance is alleged to exist, the attorney general or any citizen of the state may bring an action in the name of the state, upon the relation of the attorney general or of an individual citizen, to abate the nuisance and to perpetually enjoin the person or persons maintaining the nuisance and any or all persons owning any legal or equitable interest in the place from further maintaining or permitting the nuisance either directly or indirectly. The complaint shall be duly sworn to by the complaining party, unless brought by the attorney general, and shall set forth the names of the parties, the object of the action, a description of the place complained of, and a statement of the facts constituting the alleged nuisance."
Here, the Attorney General, as guardian of the public, asserts that the defendants, as manufacturers, promoters and suppliers, are responsible for the presence of lead, a substance alleged to be a health hazard to members of the public, in public and private buildings throughout the State.[9] Further, the State also contends that the defendants' misconduct, by causing a public health crisis, has caused the State to incur substantial damages. In its expansive request for relief, the State, in part, seeks an order for the abatement of lead.
In support of its claim, the State relies in part upon the legislative findings codified in the LPPA. General Laws 1956 § 23-24.6-2
expresses the significant legislative findings regarding the dangers to the public resulting from exposure to lead:
 "The general assembly finds, upon the report of the environmental lead task force, and the reports, hearings, and records of its own committees and of federal agencies including the environmental protection agency and centers for disease control, that:
 (1) Environmental exposures to even low levels of lead increase a child's risks of developing permanent learning disabilities, reduced concentration and attentiveness and behavior problems, problems which may persist and adversely affect the child's chances for success in school and life.
 (2) Childhood lead poisoning is caused by environmental exposure to lead. The most significant sources of environmental lead are lead based paint in older housing and house dust and soil contaminated by such paint.
 (3) Childhood lead poisoning is completely preventable.
 (4) Rhode Island does not currently have a comprehensive strategy in place for preventing childhood lead poisoning. As a result, tens of thousands of Rhode Island's children are poisoned by lead at levels believed to be harmful, with most of these poisoned children going undiagnosed and untreated.
 (5) Childhood lead poisoning is dangerous to the public health, safety, and general welfare of the people and necessitates excessive and disproportionate expenditure of public funds for health care and special education, causing a drain upon public revenue.
 (6) The enactment and enforcement of this chapter is essential to the public interest. It is intended that the provisions of this chapter be liberally construed to effectuate its purposes.
 (7) The magnitude of the childhood lead poisoning in Rhode Island's older homes and urban areas is a result of approved use of lead based materials over such an extended period in public buildings and systems as well as private housing that a comprehensive approach is necessary to alleviate the cause, identify and treat the children, rehabilitate the affected housing where young children reside, and dispose of the hazardous material. Rhode Island presently does not have the public nor the private resources to handle the total problem, thereby requiring prioritizing on a need basis. (Emphasis added.)
Moreover, as previously stated, the purpose of the LPPA "is to protect the public health and public interest by establishing a comprehensive program to reduce exposure to environmental lead and thereby prevent childhood lead poisoning, the most severe environmental health problem in Rhode Island." G.L. 1956 § 23-24.6-3.
Our Supreme Court has recognized the Attorney General's prosecution of a public nuisance action seeking abatement of lead paint from a premises where "significant amounts of lead ha[d] been found to constitute a hazard to the public and to children, in particular." Pine v. Kalian,723 A.2d 804, 805 (R.I. 1998) (order) (affirming trial court order granting preliminary injunction). The matter involved an application for a preliminary injunction by the Attorney General and the Director of the Department of Health who asserted "an overriding public interest in the protection of public health." Pine v. Kalian, C. A. 96-2673, February 2, 2000, Israel, J. The trial justice, having found certain facts based on the evidence before him, had stated his belief that at a hearing on the merits, the Court "would rule as a matter of law based on the evidence . . . [that] the premises are a public nuisance." Id. Accordingly, the trial court, after including a reference to its general equitable power as well as jurisdiction pursuant to G.L. 1956 § 10-1-1 et seq. to abate a public nuisance upon application of the Attorney General, granted the application for a preliminary injunction and ordered, in part, that the defendants abate all lead hazards from the premises.[10] In its affirmance order, the Supreme Court acknowledged the trial justice's finding that the "persistence of the continuing hazard of lead paint presents immediate and irreparable harm to the public so long as that hazard remains unabated." Pine, 723 A.2d at 805.
Rhode Island case law defines a public nuisance as "an unreasonable interference with a right common to the general public: it is behavior that unreasonably interferes with the health, safety, peace, comfort or convenience of the general community." Citizens for Preservation of Waterman Lake v. Davis, 420 A.2d 53, 59 (R.I. 1980) (citing Copart Industries, Inc. v. Consolidated Edison Company of New York, 41 N.Y.2d 564, 568, 362 N.E.2d 968, 971, 394 N.Y.S.2d 169, 172 (1977)); Radigan v. W. J. Halloran Co., 97 R.I. 122, 128, 196 A.2d 160, 163 (1963); see also Hydro-Manufacturing, Inc. v. Kayser-Roth Corp., 640 A.2d 950, 957 (R.I. 1994); 4 Restatement (Second) Torts §§ 821B(1), (2)(a) at 87 (1979). The burden of proving a nuisance is upon the party alleging it who must "demonstrate the existence of the nuisance, and that injury has been caused by the nuisance complained of." Citizens for Preservation of Waterman Lake, 420 A.2d at 59 (citations omitted). However, "the law does not attempt to impose liability in every case in which one person's conduct has some detrimental effect on another." Id. "Liability is imposed only in those cases in which the harm or risk to one is greater than he ought to be required to bear under the circumstances." Id. (citing 4 Restatement (Second) Torts § 822, cmt. g at 112 (1979)). Nevertheless, "[o]ne is subject to liability for a nuisance caused by an activity, not only when he carries on the activity but also when he participates to a substantial extent in carrying it on." 4 Restatement (Second) Torts § 834 at 149 (1979).
According to the defendants herein, the State has not asserted a public nuisance claim because a public right has not been infringed and because the defendants' lead did not cause the alleged harm while within their control as product manufacturers or promoters. Further, the defendants contend that the allegations fail to satisfy the language of § 10-1-1
regarding enjoining the person(s) "maintaining the nuisance and any and all persons owning any legal or equitable interest in the place from further maintaining or permitting the nuisance."
The State alleges that the defendants are responsible for the presence of lead, a product recognized by our courts and the Legislature as constituting a potentially severe health hazard to members of the public, in public and private properties throughout the State. It further contends that the defendants' misconduct, including a conspiracy calculated to mislead the public and the government regarding the danger to the public resulting from exposure to lead, has unreasonably interfered with the public health, including the public's right to be free from the hazards of unabated lead.
The issue before this Court is whether the State has sufficiently averred that the defendants have unreasonably interfered with a right common to the general public: more specifically, whether their conduct has unreasonably interfered with the health, safety, peace, comfort or convenience of the general community. Citizens for Preservation of Waterman Lake, 420 A.2d at 59. Further, reasonableness is a question of fact. See Gimmicks, Inc. v. Dettore, 612 A.2d 655, 659 (R.I. 1992) (citing DeNucci v. Pezza, 114 R.I. 123, 129, 329 A.2d 807, 810 (1974)) ("noise must be unreasonable to rise to the level of a [private] nuisance, and reasonableness is a question of fact"). Moreover, in Pucci v. Algiere where a party contended that the remedy for abatement of common law nuisances is controlled by § 10-1-1, the Supreme Court determined that the Superior Court could consider the matter before it "as constituting a nuisance at common law" despite noncompliance with § 10-1-1[11] because "the remedy set forth therein is neither exclusive nor mandatory." 106 R.I. 411, 419-20, 261 A.2d 1, 6-7 (1970). Accordingly, in light of the legislative findings in the LPPA and our caselaw, including Kalian, assuming the facts as alleged in the complaint are true, and drawing all reasonable inferences in favor of the State, the Attorney General has adequately asserted an action for public nuisance. Accordingly, the defendants' motion to dismiss the public nuisance count is denied.
 Count II — Violation of R.I. Unfair Trade Practice and Consumer Protection Act [G.L. § 6-13.1-1 et seq.]
In his second count, pursuant to G.L. 1956 § 6-13.1-5, the Attorney General alleges the defendants violated the UTPA thereby proximately causing the State to suffer substantial damages. Specifically, the State alleges that the defendants have violated the Act,
 "among other things, by
 a. Making false and/or misleading statements that had, and have, the capacity, tendency or effect of deceiving or misleading Rhode Island consumers;
 b. Failing to state material facts regarding the dangers of exposure to Lead, the omission of which deceived or tended to deceive."
A. Compl., ¶¶ 48-51.
In pertinent part, the UTPA makes unlawful "unfair or deceptive acts or practices in the conduct of any trade or commerce." G.L. 1956 §6-13.1-2. When the UTPA became law on June 1, 1968, the relevant provision, § 6-13.1-5, read:
 "Whenever the attorney general has reason to believe that any person is using or is about to use any method, act, or practice declared by § 6-13.1-2 of this act to be unlawful, and that proceedings would be in the public interest, [the attorney general] may bring an action in the name of the state against such person to restrain by temporary or permanent injunction the use of the method, act, or practice. . . . The courts are authorized to issue temporary or permanent injunctions to restrain and prevent violations of this act. . . ."
P. L. 1968, ch. 12, §§ 1, 2. (Emphasis added.) Subsequently, in 1970, the Legislature added the term "has used" to the original provision:
 "Whenever the attorney general has reason to believe that any person is using, has used, or is about to use any method, act or practice declared by section 6-13.1-2
of this act to be unlawful, and that proceedings would be in the public interest, [the attorney general] may bring an action in the name of the state against such person to restrain by temporary or permanent injunction the use of the method, act, or practice. . . ."
P.L. 1970, ch. 249, § 2. (Emphasis added.) The subject 1970 amendment expressly states that it shall take effect upon its passage. P.L. 1970, ch. 249, § 5.
The defendants argue that this claim fails because the statute may not be applied retroactively and because the State does not have standing under § 6-13.1-5 to bring a claim for damages or affirmative injunctive relief. Further, the defendants contend that the State is not seeking to enjoin defendants from recently or presently engaging in unfair or deceptive trade practices. In opposition, the Attorney General, while asserting that the State's UTPA claim is not based on a retroactive application of the statute, contends that the addition of the term "has used" in 1970 manifests an intent by the General Assembly to allow pre-1970 misconduct to form a basis of recovery for post-1970 damages and relief. The Attorney General argues that the statute is remedial and should be construed broadly, and also that the amendment relates back to the original statute thereby encompassing any harm that occurred after the 1968 enactment.
It is well-settled that statutes and their amendments are presumed to apply prospectively. Hydro-Manufacturing, Inc., 640 A.2d at 954 (citing Lawrence v. Anheuser-Busch, Inc., 523 A.2d 864, 869 (R.I. 1987)); Dunbar v. Tammelleo, 673 A.2d 1063, 1065 (R.I. 1996) ("statute will generally be construed to operate prospectively from and after effective date of statute"); Avanzo v. Rhode Island Department of Human Services,625 A.2d 208, 211 (R.I. 1993) (only when a statute "contains clear and explicit language requiring retroactive application [will] that statute be interpreted to operate retroactively"). "Only when `it appears by clear, strong language or by necessary implication that the Legislature intended' a statute to have retroactive application will the courts apply it retroactively." Hydro-Manufacturing, Inc., 640 A.2d at 954-55 (citing VanMarter v. Royal Indemnity Co., 556 A.2d 41, 44 (R.I. 1989)). When a statute lacks "the requisite specificity or necessary implication regarding retroactivity, the distinction between a substantive statute and a remedial or procedural statute comes into play." Lawrence, 523 A.2d at 869. However, the "clear enunciation of a legislative choice overrides any constructional preference for prospective or retrospective application that otherwise might obtain." Id. (quoting Raymond v. Jenard, 120 R.I. 634, 637, 390 A.2d 358, 359 (1978)).
Arguably, the use of the words "has used" in the amendment could be construed as a retroactive intention; however, the Legislature specifically articulated its intention that the subject amendment "shall take effect upon passage." P.L. 1970, ch. 249, § 5. The language "shall take effect upon passage" indicates a prospective intent. Hydro-Manufacturing, Inc., 640 A.2d at 955; see also Jennings v. U.S. Bobbin Shuttle Co., 44 R.I. 388, 117 A. 647 (R.I. 1922) ("statutes are presumably intended to operate prospectively, and words should not have a retrospective operation unless they are so clear, strong and imperative that no other meaning can be annexed to them or the Legislature's intention cannot be otherwise satisfied"). Further, as maintained by the defendants, other meaning can be applied to the term "has used." For example, that the amendment prevents a defendant from avoiding prosecution by terminating misconduct. Accordingly, this Court must construe § 6-13.1-5, as amended, as operating prospectively. Consequently, the Attorney General's contentions that pre-amendment conduct which causes post-amendment damages is within the purview of § 6-13.1-5 and not a retroactive application of the statute must fail.
Beneath the assertions of ongoing harms resulting from the alleged unfair or deceptive acts or practices of the defendants, the latest-dated misconduct complained of occurred in 1962. A. Compl., ¶ 39(b). Further, the Attorney General concedes that "Defendants finally discontinued manufacturing and promoting Lead in 1978 when the federal government required them to do so." P. Mem. in Opp. at 50; see also Am. Compl., ¶ 20 ("the use of Lead was banned for residential use in the United States in 1978"). Nevertheless, a careful reading of the complaint reveals allegations that may be construed as past, as well as continuing, unlawful and deceptive practices by the defendants. Because the amendment to § 6-13.1-5 requires prospective application, the Attorney General can rely on the term "has used" to prosecute an action for misconduct that occurred after, not before, the 1970 amendment. Further, in light of the legislative findings contained in the LPPA, it is reasonable to believe that this action is in the public interest. Accordingly, the Attorney General has pled sufficient factual allegations to withstand the defendant's motion to dismiss. Further, whether since the time when the operative language is applicable, such unlawful and deceptive practices have occurred is a question of fact. Accordingly, it is inappropriate to dismiss the UTPA claim.
Based on the foregoing and the State's expansive request for injunctive relief, this Court need not reach the defendants' challenge regarding the Attorney General's standing pursuant to § 6-13.1-5 to bring an action for prospective injunctive relief and/or the State's alleged damages.
 Counts III, IV, V and VI — Strict Liability, Negligence, Negligent Misrepresentations and Omissions, and Fraudulent Misrepresentations and Omissions
In Count III of its complaint, the State asserts a strict liability claim against manufacturing defendants. The State alleges negligence, negligent misrepresentations and omissions, and fraudulent misrepresentations and omissions, Counts IV — VI respectively, against all defendants. In response, the defendants contend that the tort claims are barred because of the statute of repose found in G.L. 1956 § 9-1-29 and because they are too remote or derivative.
 Statute of Repose
It is undisputed that § 9-1-29 is a statute of repose. See Allbee v. Crane Co., 644 A.2d 308 (R.I. 1994) (order). Section 9-1-29, entitled "Construction of improvements to real property — Immunity from liability," provides:
 "No action (including arbitration proceedings) in tort to recover damages shall be brought against any architect or professional engineer who designed, planned, or supervised to any extent the construction of improvements to real property, or against any contractor or subcontractor who constructed the improvements to real property, or material suppliers who furnished materials for the construction of the improvements, on account of any deficiency in the design, planning, supervision, or observation of construction or construction of any such improvements or in the materials furnished for the improvements:
 (1) For injury to property, real or personal, arising out of any such deficiency;
 (2) For injury to the person or for wrongful death arising out of any such deficiency; or
 (3) For contribution or indemnity for damages sustained on account of any injury mentioned in subdivisions (1) and (2) hereof more than ten (10) years after substantial completion of such an improvement; provided, however, that this shall not be construed to extend the time in which actions may otherwise be brought under §§ 9-1-13 and 9-1-14."
The purpose of the statute of repose in § 9-1-29 is well-settled. In enacting § 9-1-29, the General Assembly required that individuals seeking recovery in tort against constructors of improvements to real property bring an action within ten years of the substantial completion of the improvement. Qualitex, Inc. v. Coventry Realty Corp., 557 A.2d 850, 852 (1989). The Legislature enacted this statute of repose in reaction to the extinction of the doctrine of privity. Walsh v. Gowing,494 A.2d 543, 546 (R.I. 1985). With the abrogation of this doctrine, architects, engineers, and others ceased to enjoy immunity from liability to third parties. Id. (citing Temple Sinai-Suburban Reform Temple v. Richmond, 112 R.I. 234, 308 A.2d 508 (1973)). Therefore, the General Assembly attempted to shield "architects, professional engineers, contractors, subcontractors, and materialmen" and to provide them with a reasonable limitation on their greatly expanded potential liability. Qualitex, Inc., 557 A.2d at 852 (1989) (citing Walsh v. Gowing, 494 A.2d at 546).
In Qualitex, the court considered whether a fire-sprinkler system is an improvement to real property for the purposes of § 9-1-29 and whether the statute protected the manufacturer of the system from liability. 557 A.2d at 852-53. After finding that the fire-sprinkler system is "within the `improvement to real property' language within the statute," the court then, construing the broadly written language of the statute, determined that "[m]anufacturers, just like architects, engineers, contractors, and subcontractors, need protection from individuals whose negligence in maintaining an improvement to real property may cause liability." Id. at 853 (citing J. H. Westerman Co. v. Fireman's Fund Insurance Co., 499 A.2d 116, 121 (D.C. App. 1985)). Further, in Qualitex, the court, found that the defendant who allegedly "designed, manufactured, inspected and installed" the fire-sprinkler system, as manufacturer, installer and supplier, was a materialman[12]
for purposes of § 9-1-29. Id. Accordingly, the Qualitex Court held that the defendant, as materialman or manufacturer, was entitled to the protection of § 9-1-29.
In the matter before this Court, the defendants, over the State's objection, argue that paint, like the fire-sprinkler system, is within the "improvement to real property" language of § 9-1-29 and further, that as manufacturers, they are immune from liability. However, the matter herein involves a significant distinction. The relevant causes of action are not brought against the manufacturing defendants as manufacturers of paint. Rather, they are brought against the manufacturing defendants in relation to the manufacture of lead, specifically "all lead products contained in paint and coatings." A. Compl., ¶ 13.
In light of the Qualitex analysis, this Court finds that the statute is not calculated to include lead, an ingredient in paint, as within the "improvement to real property" language and thereby afford protection to the manufacturers of such ingredients.[13] Accordingly, as to the manufacturing defendants, the defense of the statute of repose is not applicable. In light of this Court's finding regarding lead, it follows that the LIA, as an alleged promoter of the lead, may not rely on §9-1-29 as a defense to the relevant causes of action.
 Nullum Tempus
Having determined that § 9-1-29 is not applicable to the counts herein, this Court need not decide whether the State, as the Attorney General argues, may invoke the common law doctrine of nullum tempus to avoid its time limitation. However, to the extent that the State, pursuant to the subject counts, seeks to protect a public right, the doctrine of nullum tempus allows the Attorney General to avoid any relevant statute of limitation. Under the doctrine of nullum tempus, "the sovereign is exempt from the consequences of its laches, and from the operation of statutes of limitations," unless the statute specifically provides otherwise. Guaranty Trust Co. v. United States,304 U.S. 126, 132-33, 58 S.Ct. 785, 82 L.Ed. 1224 (1938). The policy behind the doctrine has been the preservation of the public rights, revenues, and property from injury or loss, by the negligence of public officers. Id. at 132. The doctrine is well-established in Rhode Island. See Almy v. Church, 18 R.I. 182, 187-88, 26 A. 58, 60 (1893) (the ancient maxim "Nullum tempus occurrit regi" is in force in this state); see also Searle v. Laraway, 27 R.I. 557, 65 A. 269 (1906); State of Rhode Island v. Pawtuxet Turnpike Co., 8 R.I. 521, 524 (1867) ("Indeed, no length of usurpation shall affect the Crown, nullum tempus occurrit regi; the Attorney General being a public officer, may be presumed to be capable of a salutary and reasonable discretion, as well as the court, and when acting in behalf of the State [quo warranto], he deems it his duty to prosecute for a forfeiture, it is not for the court, in the absence of any statutory limitation, to say he is too late.").
However, the subject counts are common law tort claims for strict liability, negligence, negligent misrepresentations and omissions, and fraudulent misrepresentations and omissions. To the extent that these torts are alleged to affect consumers, the general public or residents of the State, they could have been filed by any private litigant against the defendants. Accordingly the State is not making a claim in its governmental capacity to preserve a public right. Further, under Rhode Island law, it is well-settled that "the common law forbids the assignment of one's cause of action to recover for personal injuries."
Hospital Service Corp. of Rhode Island v. Pennsylvania Ins. Co.,101 R.I. 708, 712, 227 A.2d 105, 109 (1967). Accordingly, the Attorney General may not invoke the nullum tempus doctrine for such a purpose and may not prosecute tort claims for individual citizens
To the extent that the State's allegations claim harm resulting from lead in public buildings, the State retains the nullum tempus exemption from the operation of a statute of limitations, unless by its terms the statute expressly includes the State. The pertinent statute of limitations, G.L. 1956 § 9-1-13, does not expressly exempt the State.[14] Accordingly, this portion of State's tort claims survives the motions to dismiss.
 Remoteness
Even if the subject counts did not suffer from the infirmities already mentioned, these claims would still be barred because, as the defendants contend, to the extent that they are entirely derived from alleged damages to others, they are too remote to be recoverable by the State. The doctrine of remoteness bars recovery in tort for indirect harm suffered as a result of injuries directly sustained by another person. In the context of a securities fraud action, the United States Supreme Court recognized that the concept of proximate causation generally requires "some direct relation between the injury asserted and the injurious conduct alleged." Holmes v. Securities Investor Protection Corp., 503 U.S. 258, 268, 112 S.Ct. 1311, 117 L.Ed.2d 532 (1992). Therefore, "a plaintiff who complain[s] of harm flowing merely from the misfortunes visited upon a third person by the defendant's acts [is] generally said to stand at too remote a distance to recover." Holmes, 503 U.S. at 268-69 (citing 1 J. Sutherland, Law of Damages 55-56 (1882)). In support of the directness of relationship requirement, the Holmes Court articulated a three factor rationale:
 "First, the less direct an injury is, the more difficult it becomes to ascertain the amount of the plaintiff's damages attributable to the [defendant's wrongdoing], as distinct from other, independent factors. Second, quite apart from problems of proving factual causation, recognizing claims of the indirectly injured would force courts to adopt complicated rules apportioning damages among plaintiffs removed at different levels of injury from the [wrongdoing], to obviate the risk of multiple recoveries. And, finally, the need to grapple with these problems is simply unjustified by the general interest in deterring injurious conduct, since directly injured victims can generally be counted on to vindicate the law as private attorneys general, without any of the problems attendant upon suits by plaintiffs injured more remotely."Id. at 269-70 (citations omitted).
The State contends that this Court should permit its claim to recover the costs of providing lead-related services to the public because the defendants' alleged wrongdoing has caused direct injuries to the State itself, that the claims are not derivative. It alleges:
 "As a direct and proximate result of these and other wrongful actions by the Defendants, the State has suffered substantial damages, including, but not limited to, the costs of discovering and abating Lead, the expenditure of State funds to detect lead poisoning and provide medical and/or other care of lead poisoned residents of the State, the costs of education programs for children suffering injuries as a result of Lead exposure and the costs of education programs for residents of the State due to the dangers present as a result of Lead in the State. These costs continue to mount as residents of the State continue to be exposed to Defendants' Lead." Am. Compl., ¶ 42.
However, the State would not have suffered its alleged injuries unless, for example, some consumer(s) chose to purchase lead-products and subsequently expose residents of Rhode Island to lead. These expenditures construed as injuries by the State are inescapably contingent on direct or speculative harm to such persons and accordingly are too derivative, remote, or contingent to support a cognizable tort claim.
 Count VII — Civil Conspiracy
In this count, the State, after incorporating the foregoing allegations, avers in relevant part that the defendants conspired to "conceal the known hazards of lead, to mislead the public and the government as to those hazards, and to market and promote the use of the product despite such knowledge of the hazards." A. Compl., ¶ 85. The defendants contend that this count fails because a civil conspiracy claim requires an actionable underlying wrong and none exists.
The tort of civil conspiracy exists in Rhode Island. ERI Max Entertainment, Inc. v. Streisand, 690 A.2d 1351, 1354 (R.I. 1997), and is established by evidence from "which a party may reasonably infer the joint assent of the minds of two or more parties to the prosecution of the unlawful enterprise." Stubbs v. Taft, 88 R.I. 462, 468, 149 A.2d 706, 708-09 (1959) (citation omitted); see also Sullivan v. Faria, 112 R.I. 132, 138, 308 A.2d 473, 477 (1973) (a civil conspiracy claim fails without evidence "to show the requisite unlawful purpose or unlawful means"); Guilbeault v. R.J. Reynolds Tobacco Co., 84 F. Supp.2d 263, 268 (D.R.I. 2000) (Under Rhode Island law, "a civil conspiracy claim requires the specific intent to do something illegal or tortious").
The State alleges that the defendants wrongfully agreed to mislead the public regarding the hazards of lead and to market and promote it without proper warnings, all the while knowing the dangers that lead presented, especially to children. Because a valid claim for civil conspiracy requires a collaborative intent to do something unlawful and because this Court has not dismissed the State's entire complaint, the conspiracy count survives this stage of the proceedings.
 Count VIII — Unjust Enrichment
The complaint alleges that the defendants have been and continue to be unjustly enriched because the State's paying of lead-related costs resulting from the harms caused by the defendant's conduct has conferred a benefit on the defendants by allowing them to derive substantial economic benefit. The defendants counter that the alleged "conferred benefit" is not legally cognizable.
The doctrine of unjust enrichment "permits the recovery in certain instances where a person has received from another a benefit, the retention of which, would be unjust under some legal principle, a situation which equity has established or recognized." Merchants Mutual Insurance Co. v. Newport Hospital, 108 R.I. 86, 93, 272 A.2d 329, 332 (1971). "[T]he unjust enrichment doctrine has for its basis that in a given situation it is contrary to equity and good conscience for one to retain a benefit that has come to him [or her] at the expense of another and that it is not necessary in order to create the obligation to make restitution or to compensate that the party unjustly enriched be guilty of a tortious or fraudulent act." Id. In Rhode Island, "actions brought upon theories of unjust enrichment and quasi-contract are essentially the same." Bouchard v. Price, 694 A.2d 670, 673 (R.I. 1997) (quoting R B Electric Co. v. Amco Construction Co., 471 A.2d 1351, 1355 (R.I. 1984). It is well-settled that "in order to recover under quasi-contract for unjust enrichment, a plaintiff is required to prove three elements: (1) a benefit must be conferred upon the defendant by the plaintiff, (2) there must be appreciation by the defendant of such benefit, and (3) there must be an acceptance of such benefit in such circumstances that it would be inequitable for a defendant to retain the benefit without paying the value thereof." Id. (citations omitted).
Under the doctrine of unjust enrichment, the concept of benefit is construed broadly:
 "a person confers a benefit upon another if he [or she] . . . satisfies a debt or a duty of the other, or in any way adds to the other's security or advantage. He [or she] confers a benefit not only where he [or she] adds to the property of another, but also where he [or she] saves the other from expense or loss. The word `benefit,' therefore, denotes any form of advantage." Restatement of Restitution § 1, cmt. b at 12 (1937).
Here, the Attorney General alleges that the State's payment of Lead-related costs has allowed and continues to allow the defendants to derive economic gain from their promotion and sale of lead while, at the State's expense, avoiding responsibility for the damages it has caused. Further the State alleges that the defendants have appreciated this benefit and that retention of the benefit is inequitable. In order for the defendants to succeed on their motion to dismiss, they are required to show that the State would not be entitled to relief under any of its alleged facts. It is impossible for the Court to determine at this stage that the State's lead-related expenditures have not added to the defendants', including the LIA's, advantage or saved them from loss. Accordingly, the State's pleading is sufficient with respect to its claim for unjust enrichment.
 Count IX — Indemnity
The State's claim for equitable indemnification is based on the alleged intentional, negligent and/or other wrongful conduct of the defendants. The Attorney General contends that according to equitable principles, the defendants should be legally responsible for the State's lead-related expenditures because they, he alleges, result from the hazards created by the defendants' lead.
The concept of indemnity is "based upon the theory that a party who has been exposed to liability solely as a result of the wrongdoing of another should be able to recover from the wrongdoer." McCrory v. Spigel,740 A.2d 1274, 1276-77 (R.I. 1999) (citing Muldowney v. Weatherking Products, Inc., 509 A.2d 441 (R.I. 1986)). In explaining the concept, our Supreme Court has stated:
 "Everyone is deemed responsible for the consequences of his or her own acts. The responsibility extends not only to the person directly injured but also to the one indirectly harmed by being held liable by operation of law. . . . If another person has been compelled to pay damages that should have been paid by the wrongdoer, the latter becomes liable to the former." Muldowney, 509 A.2d at 443-44 (citations omitted).
A prospective indemnitee must prove three requisite elements:
 "First, the party seeking indemnity must be liable to a third party. Second, the prospective indemnitor must also be liable to the third party. Third, as between the prospective indemnitee and indemnitor, the obligation ought to be discharged by the indemnitor." Id. at 443.
"Indemnity can only be obtained when the liability of the claimant is solely constructive or derivative and only when the prospective indemnitor's wrongful acts have caused such liability to be imposed." Id. at 444. "One situation satisfying th[e] third element is when a potential indemnitor is at fault and the prospective indemnitee is blameless." Wilson v. Krasnoff, 560 A.2d 335, 341 (R.I. 1989) (citing Muldowney, 509 A.2d at 444).
In essence, the State avers that its owes a nondelegable, legally imposed duty to the residents of the State to make lead-related expenditures which were and are necessary because the defendants intentionally, negligently or otherwise wrongfully failed to provide a reasonably safe product that would not harm the public, especially the children, who have been exposed to it. As between the State and the defendants, the Attorney General alleges, the defendants ought to bear the burden of the lead-related expenditures resulting from the damages due to lead. These averments suffice to allege legal obligations owed by the State, albeit under statutory mandate, and the defendants to third parties. Accordingly, the State has articulated the requisite elements for an indemnity claim.
 Count X — Equitable Relief to Protect Children
It the final count, the State, after incorporating the foregoing averments in its pleading, asserts that granting equitable relief requiring the defendants "to aid in the education of the general public as to hazards posed by their products and to aid in the abatement of Lead hazards throughout the State is the only way to end the long-standing cycle of exposure, injury and permanent damage suffered by children in this State." A. Compl., ¶ 108. The defendants counter that the law of Rhode Island does not permit this count to stand as an independent cause of action.
An injunction is a "court order prohibiting someone from doing some specified act or commanding someone to undo some wrong or injury." See Black's Law Dictionary 784 (West 6th ed. 1990). Whereas injunctions are
 "equitable remedies whose grant or denial in each case is governed by principles of equity, the rights or subjects that properly lie within the power of a court of equity to control or protect by injunction are the same as those over which equity jurisdiction extends generally. A court of equity does not create rights, but rather determines whether legal rights exist and, if so, whether it is proper and just to enforce those rights. In short, a court may exert its equitable powers to grant appropriate relief only when a judicially cognizable right exists, and no adequate legal remedy is available."
42 Am Jur 2d Injunctions § 46 (2000). In order for an injunction to issue, the moving party must demonstrate that rights in question will be irreparably injured or endangered if the injunction is not issued. School Committee of Pawtucket v. Pawtucket Teachers' Alliance, Local No. 930, 117 R.I. 203, 206, 365 A.2d 499, 501 (R.I. 1976).
The State argues that a request for an injunction which is premised solely on allegations of imminent, irreparable harm without an underlying claim or allegation of statutory duty amounts to an independent cause of action under Rhode Island law. However, as the defendants counter, in each of the cases relied upon by the State, the plaintiff asserted an infringement of a particular right and requested injunctive relief as a remedy therefor.
In its amended complaint, the State, after averring several causes of action, requests in pertinent part rather extensive injunctive relief. Upon proving its burden with respect to "judicially cognizable rights," the State may indeed obtain equitable relief. See, e.g., The Fund for Community Progress v. United Way of Southeastern New England, 695 A.2d 517, 521 (R.I. 1997) ("The moving party seeking a preliminary injunction must demonstrate that it stands to suffer some irreparable harm that is presently threatened or imminent and for which no adequate legal remedy exists to restore that plaintiff to its rightful position."); City of Woonsocket v. Forte Brothers, Inc., 642 A.2d 1158, 1159 (R.I. 1994) (Despite different procedural requirements, the "same criteria must be established to issue either a preliminary injunction or a temporary restraining order."). However, the formulation of this count as a claim for injunctive relief to protect children is, in this Court's reading, duplicative of the relief requested by the State in the "Relief Requested" section of its amended complaint. Moreover, absent controlling caselaw establishing that a request for injunctive relief constitutes an independent cause of action, injunctive relief is a remedy and, can not, in itself, be recognized as a substantive claim. Accordingly, the request for injunctive relief as articulated herein cannot stand as a separate cause of action and this claim for injunctive relief to protect children fails.
 Court's Order
Counsel for the plaintiff is directed to present to the Court an appropriate order consistent with the foregoing to be settled after notice and an opportunity for all parties to be heard.
[1] The named defendants include Lead Industries Association, Inc., American Cyanamid Company, Atlantic Richfield Company, E. I. DuPont De Nemours and Company, The O'Brien Company, the Glidden Company, NL Industries, Inc., SCM Chemicals, and The Sherwin-Williams Company, some being successors-in-interest to other entities.
[2] The State avers that "American Cyanamid, Atlantic Richfield, DuPont, O'Brien, Glidden, NL Industries, SCM Chemicals and Sherwin-Williams and their agents, servants, aiders and/or abettors and co-conspirators ( Manufacturing Defendants) manufactured, processed, marketed, promoted, supplied, distributed and/or sold all or substantially all lead products contained in paint and coatings ( Lead) during the relevant time period." A. Compl., ¶ 13.
[3] "As a direct and proximate result of these and other wrongful actions by the defendants, the State has suffered substantial damages, including but not limited to, the costs of discovering and abating Lead, the expenditure of State funds to detect lead poisoning and provide medical and/or other care of lead poisoned residents of the State, the costs of education programs for children suffering injuries as a result of Lead exposure and the costs of education programs for residents of the State due to the dangers present as a result of Lead in the State. These costs continue to mount as residents of the State continue to be exposed to Defendants' Lead." Am. Compl., ¶ 42.
[4] The named defendants are collectively referred to hereinafter as the defendants.
[5] General Laws 1956 §§ 6-36-12 (Rhode Island Antitrust Act);40-8.2-6 (Medical Assistance Fraud); 42-9.1-1 (Office of Health Care Advocate); and 46-12.3-5 (Environmental Injury Compensation Act).
[6] Sherwin-Williams Mem. at 3.
[7] See, e.g., G. L. 1956 § 23-19.1-181(g) of the Hazardous Waste Management Act of 1978, enacted by P.L. 1982, ch. 337, § 2 which provides: "The provisions of this section [Determination of restoration costs — Judgment — Other relief not precluded] shall not preclude the state or attorney general or department of environmental management from seeking any other relief authorized by other statute or common law."
[8] Am. Compl., ¶¶ 44, 46.
[9] The Attorney General distinguishes this claim as a "public nuisance, massive harm to the community" as opposed to an action brought in a governmental entity's "proprietary capacity for buildings that it owned." Tr. at 133.
[10] The trial court also referenced its statutory authority to grant injunctive relief upon application of the director of the Department of Health. G.L. 1956 §§ 23-1-23 and 23-24.6-23.
[11] Although § 10-1-1 does not define nuisances, "statutes defining nuisances generally do not change the common-law definition of the term" or "supersede the common law as to other acts which constitute a public nuisance at common law." 58 Am Jur 2d Nuisances § 61 (1989). Moreover, "statutory remedies for the abatement of nuisances do not, as a rule, supersede existing common law remedies." Id.
[12] The Court defined materialman as one who "`furnish[es] materials or supplies used in construction or repair of a building [or] structure.'" Id. at 953 (quoting Black's Law Dictionary 881 (West 5th ed. 1979)).
[13] An "improvement" is "a valuable addition made to property (usually real estate) or an amelioration in its condition, amounting to more than mere repairs or replacement, costing labor or capital, and intended to enhance its value, beauty or utility or to adapt it for new or further purposes." Black's Law Dictionary 757 (West 6th ed. 1990).
[14] General Laws § 9-1-13, entitled "Limitation of actions generally — Product liability" provides:
 "(a) Except as otherwise specially provided, all civil actions shall be commenced within ten (10) years next after the cause of action shall accrue, and not after.
 (b) [Ruled unconstitutional] Notwithstanding the provisions of subsection (a) of this section, an action for the recovery of damages for personal injury, death, or damage to real or personal property, including any action based upon implied warranties arising out of an alleged design, inspection, listing or manufacturing defect, or any other alleged defect of whatsoever kind or nature in a product, or arising out of any alleged failure to warn regarding a product, or arising out of any alleged failure to properly instruct in the use of a product, shall be commenced within ten (10) years after the date the product was first purchased for use or consumption."