Shayle ROBINSON, Administrator of
the Estate of Florence A. Izzi,

v.

Elisa DELFINO et al.

No. 96–316–Appeal.

Supreme Court of Rhode Island.

April 3, 1998.

Steven Aaron Robinson, Providence,
Shayle Robinson, Cranston, for Plaintiff.

Rosemary Healey, James M.Green, Chris-
topher D. Healey, Providence, for Defendant.

Before WEISBERGER, C.J., and
LEDERBERG, BOURCIER, FLANDERS
and GOLDBERG, JJ.

## OPINION

BOURCIER, Justice.

This case came before us on the appeal of
the defendants, Elisa Delfino (Delfino), Delfi-
no's husband, Paul, and Donald C. Rich
(Rich), from the order of a trial justice, ren-
dered after a nonjury trial in the Superior
Court.[1] The trial justice, relying primarily

---

1. Rule 52 of the Superior Court Rules of Civil
Procedure requires the trial justice to enter a
"judgment" following his or her decision in a
nonjury trial. We will consider the order en-
tered in this case to be the required judgment.

upon our opinion in *Nocera v. Lembo*, 121 R.I. 216, 397 A.2d 524 (1979), ordered the defendants to return the monetary funds previously contained in joint bank accounts that Delfino and Rich individually maintained with Florence A. Izzi.

## I

### Facts and Case Travel

On December 27, 1993, Florence A. Izzi (decedent) died intestate. At the time of her death, she had two living siblings, her brother, John Izzi (Izzi), and her sister, Delfino. Prior to her death, on August 27, 1987, the decedent had opened a joint certificate of deposit in the names of Izzi and herself. That account was funded entirely with the decedent's own money, and her Social Security number appeared on the account. Both Izzi and the decedent signed signature cards for that account. No other deposits to or withdrawals from that account were ever made.

The decedent also maintained a safe-deposit box, as a joint tenant, with Delfino, for which they both signed signature cards, and with Rich as a joint tenant, for which they also both signed signature cards.

On October 16, 1984, and April 21, 1992, Rich, who lived for many years in the decedent's home prior to and at the time of the decedent's death, had opened with his own funds two joint bank accounts in his and the decedent's names. Rich's Social Security number appeared on both of those accounts.

The decedent, on February 5, 1993, had opened three joint bank accounts in her and Rich's names with funds taken entirely from joint bank accounts the decedent maintained with her sister, Delfino.[2] The decedent's Social Security number appeared on all those accounts, and both Rich and the decedent signed account signature cards for the accounts. The signature cards all contained the statement "Joint Tenancy Account with Right of Survivorship." During the decedent's lifetime, Rich never had occasion to make any deposits into or withdrawals from those accounts. After the decedent's death, however, Rich withdrew the entire balance of the funds remaining in those accounts. In addition to those joint accounts with Rich, the decedent had also opened three other joint bank accounts with Rich—on January 28, 1991, February 24, 1992, and April 6, 1992, which were all entirely funded with her own funds and on all of which the decedent's Social Security number appeared.[3] Rich also withdrew the entire balance of those accounts after the decedent's death.

The decedent also maintained seven joint bank accounts with her sister, Delfino.[4] All the accounts were funded entirely with money from the decedent, and the decedent's Social Security number also appeared on all those accounts. After the decedent's death, Delfino withdrew the balances remaining in four of those accounts and placed those funds into joint accounts that Delfino maintained with her husband, Paul.[5]

Neither Rich nor Delfino had ever had possession of any of the passbooks, bank statements, or certificates of deposit for any of the above accounts. In addition to the joint bank accounts referenced above, the decedent also maintained a separate personal checking account in her own name.

While the decedent was in a nursing home during her last illness, she requested her

---

**2.** Prior to transferring those funds, the decedent discussed her plans with Delfino. According to Delfino, she was fully aware of and, in fact, approved of the decedent's withdrawal of those funds for deposit into joint accounts maintained with the decedent's long-time friend, Rich.

**3.** That was in itself not unusual since only one Social Security number is usually required for account reporting of taxable interest earnings.

**4.** The signature cards for four of those accounts deposited at Rhode Island Hospital Trust could not be located by the bank. The trial justice

noted, however, that "[t]he Joint Stipulation of Facts established that, as to all of the accounts in question, bank signature cards were completed and filed with the appropriate financial institution both by the Decedent and by the named joint tenant." It appears undisputed that the trial justice as well as the parties all considered those accounts in question to have been joint accounts with right of survivorship.

**5.** Delfino's husband was made a party to this action because the money is now in a joint account with him as a joint owner.

sister to retain an attorney for her. Delfino discussed with Izzi, brother to both the decedent and Delfino, the decedent's request, and Izzi recommended his own personal attorney, John Vallone (Vallone). Vallone was contacted, and he went to visit the decedent at the nursing home on December 23, 1993, a few days before she died. During that visit the decedent told Vallone that she wanted to give Delfino and Izzi a power of attorney so that they could handle her affairs.[6] However, she said that she was not yet ready to make a will. According to Vallone, the decedent also said that she did not know what she wanted to do with her money or what she wanted to do with some of the other assets in her estate. It is unclear whether the decedent, when referring to her "money," was referring to her personal bank account or to her joint accounts. Vallone apparently assumed that she was referring to the joint accounts because he then asked her if she had given the money in the joint bank accounts to other people during her lifetime. She responded that she had not. Vallone therefore personally concluded that those joint accounts would be part of the decedent's estate when she died.

In the trial justice's decision he relied in great part upon our holding in *Nocera v. Lembo*, 121 R.I. 216, 397 A.2d 524 (1979), and believed it to be applicable to the facts before him. In so doing, he attempted to determine whether the decedent had intended to make an inter vivos gift of the funds contained in the joint accounts effective at the time of her death. In *Nocera* we said that the form of a joint bank account constituted only prima facie evidence that the creator of the account intended an inter vivos gift. *Id.* at 218–19, 397 A.2d at 525. That presumption of an inter vivos gift we held could then be rebutted by "evidence tending to show that the name of the survivor was added to the account by the original owner for his [or her] convenience and not with the intention of making a gift of an interest therein to the

survivor or [by evidence tending to show] that the original owner's intention was to vest an interest in the survivor only after the owner's death." *Flynn v. Byrne*, 82 R.I. 48, 53–54, 105 A.2d 800, 803 (1954).[7]

The trial justice found controlling the trial evidence indicating that the decedent "retained dominion and control of the passbook or certificate of deposit at all times prior to her death; [that] there was no commingling of * * * money with Decedent's money in said accounts; [and that] the interest earned [on the joint accounts] was paid to Decedent and she paid any income taxes on it." Relying on that evidence, the trial justice found that there was no clear and satisfactory proof that the decedent "added the respective survivor's name to the joint accounts in dispute here with the intention of making and fully executing a present and immediate gift." The trial justice concluded that the decedent intended a testamentary transfer of her money and that as a result the funds in the joint bank accounts were not the property of the surviving joint owner but were instead the property of the decedent's estate. Accordingly, the trial justice ordered Rich and Delfino "to return any funds removed by them from any of the joint bank accounts that Decedent had opened in her name and in the name of a Defendant, plus interest earned thereon." Delfino, Rich, and Delfino's husband, the joint owner of the account into which Delfino deposited the funds she withdrew from her joint accounts with the decedent, appeal from that decision.

## II

### New Law

We conclude that the law heretofore applied to joint bank accounts both in this jurisdiction and elsewhere has been both unpredictable and inconsistent, often frustrating the public's common understanding of what it always believed that a joint bank account was intended to accomplish.[8] Ac-

---

**6.** Neither the decedent nor Vallone discussed specifically what the decedent understood to be a power of attorney.

**7.** The parties conceded that the names were not added to the joint accounts for convenience, so the trial justice did not consider that alternative.

**8.** It has been facetiously noted that there are two ways to start a civil action in this state. The first

cordingly, the time has now arrived for us to revisit our previous holdings in contested joint bank account cases, some of which date back into the last century.[9]

Courts throughout this country have approached the analysis of joint bank accounts in a variety of ways. Some courts have historically used the common law gift theory when analyzing the legal effect of a joint bank account as we recognized in *Nocera*. *See, e.g., Smith v. Youngblood,* 68 Ark. 255, 58 S.W. 42 (1900); *Ruiz v. Dow,* 113 Cal. 490, 45 P. 867 (1896); *Jacobs v. Jolley,* 29 Ind. App. 25, 62 N.E. 1028 (1902); *Schollmier v. Schoendelen,* 78 Iowa 426, 43 N.W. 282 (1889); *Goodan v. Goodan,* 184 Ky. 79, 211 S.W. 423 (1919); *Ebel v. Piehl,* 134 Mich. 64, 95 N.W. 1004 (1903); *McDonald v. Larson,* 142 Minn. 244, 171 N.W. 811 (1919); *Innes v. Potter,* 130 Minn. 320, 153 N.W. 604 (1915); *Nemcek v. Central City National Bank,* 188 Pa.Super. 518, 149 A.2d 533 (1959). *See also* A.M. Swarthout, Annotation, *Gift or trust by deposit of funds belonging to depositor in bank account in name of himself and another,* 103 A.L.R. 1123 (1938); Donald Kepner, *Five More Years of the Joint Bank Account Muddle,* 26 U.Chi.L.Rev. 376 (1959); Donald Kepner, *The Joint and Survivorship Bank Account—A Concept without a Name,* 41 Cal.L.Rev. 596 (1953). The gift theory requires the court to consider the depositor's intent and the question of whether a gift was in fact intended and accomplished by the depositor.

Other courts have used the law of trusts to determine the survivor's interest in a joint bank account. *See, e.g., Haller v. White,* 228 Md. 505, 180 A.2d 689 (1962); *Stiles v. Newschwander,* 139 N.J. Eq. 1, 49 A.2d 572 (N.J.Ch.1946). *See also* Kepner, *Five More Years, supra;* Kepner, *The Joint and Survivorship Bank Account, supra.* The trust

theory requires that before a survivorship interest in a joint bank account is granted, there must be a finding by the court that the depositor intended to convey an equitable interest in the funds in the joint account.

Still other courts have applied a joint tenancy analysis when the survivorship interest in a joint bank account is at issue, even though the four unities of time, title, interest, and possession, which were required by the common law, cannot technically be met when a joint bank account is formed because there is no true unity of interest and because the named survivor never really "possesses" the funds. *See, e.g., Farmers Bank of State of Delaware v. Howard,* 258 A.2d 299 (Del.Ch. 1969). *See also* Kepner, *Five More Years, supra;* Kepner, *The Joint and Survivorship Bank Account, supra.* Some states have avoided the joint tenancy requirement of the four unities, however, by enacting legislation that obviates the need for one or more of them when establishing a joint tenancy. *See* Kepner, 41 Cal.L.Rev. at 601 n. 28 (for listing of statutes).

Indeed, in *Millman v. Streeter,* 66 R.I. 341, 19 A.2d 254 (1941), this Court had occasion to consider the joint tenancy analysis but found lacking in a joint bank account the four necessary common law elements needed for a true joint tenancy, namely, the four unities of time, title, interest, and possession. The court in *Millman,* although not overlooking the existence of G.L.1938, ch. 431, now G.L.1956 § 34–3–1,[10] apparently misconstrued the statute's intent and purpose, which was to permit the creation of a joint tenancy ownership in personal property including a bank deposit if set up as a joint account with right of survivorship. That statute clearly permitted moneys on deposit

is pursuant to Super.R.Civ.P. 3, and the second is by opening a joint bank account with right of survivorship.

**9.** *See, e.g., Whitehead v. Smith,* 19 R.I. 135, 32 A. 168 (1895); *Providence Institution for Savings v. Carpenter,* 18 R.I. 287, 27 A. 337 (1893).

**10.** General Laws 1956 § 34–3–1 provides:
  "Tenancy in common presumed in conveyances.—All gifts, feoffments, grants, conveyances, devises or legacies, of real or *personal estate,*

which shall be made to two (2) or more persons, whether they be husband and wife or otherwise, shall be deemed to create a tenancy in common and not a joint tenancy, unless it be declared that the tenancy is to be joint, or that the conveyance is to those persons and the survivors or survivor of them, or to them as trustees or executors, or unless the intention manifestly appears that the persons shall take as joint tenants and not as tenants in common." (Emphasis added.)

standing in the names of two or more individuals designated specifically by the account documentation as joint owners to be the joint property of the named account holders and permitted full title to the account funds upon the death of one to vest "immediately and absolutely in the survivor." *Whitehead v. Smith*, 19 R.I. 135, 136, 32 A. 168, 168 (1895).

The contract theory has also been utilized by some courts, in particular, Massachusetts, in order to find a contractual right to the funds contained in a joint bank account and by so doing, to avoid completely any application or consequence of the statute of wills. *See Blanchette v. Blanchette*, 362 Mass. 518, 287 N.E.2d 459, 462 (1972); *Goldston v. Randolph*, 293 Mass. 253, 199 N.E. 896 (1936).[11] *See also* Kepner, 41 Cal.L.Rev. at 604.

Finally, some courts have interpreted the bank protection statutes of their respective states to imply that the named survivor of a joint bank account acquires a present vested property interest in that account. *Id.* Our bank protection statute, which is typical of the bank protection statutes of other states, provides:

"When a deposit has been or shall be made in any regulated institution in the name of two (2) persons and payable to either or to the survivor, such deposit, or any part thereof, or any interest or dividend thereon, may be paid to either of those persons, whether the other be living or not, or to the guardian, executor, or administrator of the survivor, and the receipt of the person so paid shall be valid and sufficient release and discharge on account of the payment so made." G.L.1956 § 19–9–14, as enacted by P.L.1995, ch. 82, § 47.[12]

The most recent trend among courts confronted with the ownership issue in joint bank accounts, however, and the trend that we conclude is most in conformity with the way the majority of the public actually perceive joint bank accounts, is that which finally recognizes that joint bank accounts cannot be uniformly understood or analyzed under any of the pre-existing common law methods. "Slowly and unevenly, through various gradations of evolution, courts have moved toward the inevitable realization that the joint and survivorship bank account has its own identity unconforming to any hitherto recognized common-law methods of transferring property." *Wright v. Bloom*, 69 Ohio St.3d 596, 635 N.E.2d 31, 37 (1994). As a result of that recognition courts have begun to treat joint bank accounts differently from gifts, trusts, joint tenancies, or contracts and have concluded that the form of the joint bank account is itself the conclusive proof of the depositor's intent to transfer a vested possessory interest in the ownership of the joint account money.[13] The most cogent discussion of that new treatment of joint bank accounts has been framed by the Ohio court in *Wright*. That court met head on with the problem of the inconsistent and unpredict-

---

**11.** *Goldston v. Randolph*, 293 Mass. 253, 199 N.E. 896 (1936), has become the lodestar of the contract approach. *See, e.g., In re Estate of Schneider*, 6 Ill.2d 180, 127 N.E.2d 445, 448 (1955); *Bishop v. Bishop's Executrix*, 293 Ky. 652, 170 S.W.2d 1, 2 (1943). The case of *In re Estate of Combee*, 601 So.2d 1165 (Fla.1992), involves a Florida statute that was intended to resolve the joint bank account problems in that state by resorting to " 'a contract theory as opposed to the earlier gift or tenancy theories.' " *Id.* at 1167. In *Scrivens v. North Easton Sav. Bank*, 166 Mass. 255, 44 N.E. 251 (1896), the Massachusetts Supreme Judicial Court originally opted for the gift theory and found it not testamentary in nature.

**12.** The progenitor of our current law was found in the 1938 laws. *See* G.L.1938, ch. 135, § 3. That statute, as with similar enactments in other jurisdictions, appears to have been intended to do away with all fictitious distinctions between gifts and transfers of real and personal property and to put to rest the ancient common law view that originally refused to recognize that one could give or receive an expectant interest in personal property. *See* 2 William Blackstone Commentaries, ch. 25 at 398.

**13.** Seventy-seven years ago the Supreme Court of Nebraska in *Dinslage v. Stratman*, 105 Neb. 274, 180 N.W. 81 (1920), said:

" 'The trend of modern decisions is toward a modification of the early English rule requiring an actual, manual delivery of the property in all cases, to constitute a valid gift inter vivos, and the substitution therefor of a symbolic or constructive delivery, where the circumstances of the case require it.' " *Id.*, 180 N.W. at 82–83.

The Nebraska court then noted that " '[i]f the gift is absolute, the mere postponement of the enjoyment until the death of the donor is not material, and will not defeat it.' " *Id.* at 83.

able conclusions reached by the Ohio courts in past cases when required to determine the survivorship rights in a joint bank account.

"Recent cases have created a morass of unpredictability, often occasioned by ambiguous and conflicting results. Presently, the depositor cannot rest assured as to whether the funds remaining in the account at his death will immediately pass to the survivor. Identical survivorship language expressly set forth in one joint and survivorship account agreement may be adjudged sufficient to pass ownership to the survivor while found to be insufficient in another." *Wright*, 635 N.E.2d at 33.

■ In an attempt to make the effect of joint bank accounts more predictable and the law surrounding joint bank accounts less ambiguous and inconsistent, the *Wright* court concluded that "the depositor's intent to transfer a present interest in a joint and survivorship account to be irrelevant in a controversy involving the rights of a surviving party to the sums remaining in such account at the death of the depositor." *Id.* at 36. The court further explained the reasoning behind its new joint bank account analysis:

"If there is one thing that is clear from reviewing the foregoing cases, it is that our efforts to determine survivorship rights by a *post-mortem* evaluation of extrinsic evidence of depositor intent are flawed to the point of offering no predictability. Regardless of the depositor's true motivation in opening a joint and survivorship account, he or she simply cannot be certain of how his or her lifetime actions will be construed in regard to transferring survivorship rights. Only when the depositor knows that the terms of the contract will be conclusive of his or her intent to transfer a survivorship interest will the depositor be able to make an informed choice as to whether to utilize the joint and survivorship account." *Id.* at 37.

Thus, the court determined that "the need for uniformity is essential," *id.*, and that to permit extrinsic proof of the depositor's intent only served to perpetuate confusion and to sanction "the use of joint and survivorship accounts by those who do not intend to trans-fer survivorship rights," thereby "encouraging the very evils of misinformation and litigation sought to be avoided" by the previous court practice of examining the depositor's intent.

The Ohio court in *Wright* cogently reasoned from what courts in jurisdictions other than Ohio had concluded, namely, that extrinsic evidence of a depositor's intent should not be permitted to defeat survivorship rights in a joint bank account, and supported their conclusions by resorting to the use of (1) the common law contract theory in which the parol evidence rule excluded evidence of intent in the absence of fraud, duress, undue influence and incapacity, (2) the common law gift theory in which the form of the account raised the presumption of an intent to make an *in praesenti* gift rebuttable only by evidence of fraud, undue influence or lack of capacity, or (3) local statutes that make the form of the account conclusive in regard to donative intent. *Wright*, 635 N.E.2d at 38. In the end, however, "[t]he theory used to describe the transaction, whether it be denominated joint tenancy, contract or gift, is meaningful only for the purpose of defining the method of effectuating the donation" and does not affect the fact that the donation did in fact take place. *Id.* at 39 (quoting Kepner, 41 Cal.L.Rev. at 613). The Ohio court in *Wright* then proceeded to hold that

"the opening of an account in joint and survivorship form shall, in the absence of fraud, duress, undue influence or lack of mental capacity on the part of the depositor, be conclusive evidence of the depositor's intention to transfer to the survivor the balance remaining in the account at the depositor's death." 635 N.E.2d at 39. *See also Fix v. Fix*, 847 S.W.2d 762 (Mo.banc 1993); *Blais v. Colebrook Guaranty Savings Bank* [107 N.H. 300], 220 A.2d 763 (N.H.1966).

The court further held that

"the opening of the account in joint or alternative form without a provision for survivorship shall be conclusive evidence, in the absence of fraud or mistake, of the depositor's intention not to transfer a survivorship interest to the joint party in the balance of funds contributed by the deposi-

tor remaining in the account at the depositor's death. Such funds shall belong exclusively to the depositor's estate\* \* \*." *Wright,* 635 N.E.2d at 39.

After carefully considering the troublesome and often inconsistent results coming from the annals of our joint bank account litigated cases, we conclude, as did the Ohio court in *Wright* and as advocated by Kepner that

> "[i]t would seem that when a depositor opens a joint and survivorship account and executes signature cards which recite that the account is to be paid to either during the depositors' joint lives and to the survivor upon the death of either, a rebuttable presumption of an intent to make a gift of a joint interest should arise. After the depositor's death only evidence of fraud, undue influence or lack of capacity should be admissible to rebut the presumption. It serves no useful social purpose to encourage litigation concerning the disposition of the balance of the joint account upon the death of the depositor, when in most instances he [or she] intended, in his [or her] unlearned manner, to make a testamentary disposition of his [or her] property. If the joint account is sound, as a means of transferring property, it should be uniformly administered." Kepner, 41 Cal.L.Rev. at 621.

■ To continue to apply the common law theory surrounding the making of inter vivos gifts to joint bank accounts and to permit the introduction of all manner of extrinsic evidence to analyze the depositor's subjective intent, as has been permitted in our previous joint bank account cases, we believe persistently ignores the fact that the absolute common understanding of the vast majority of people establishing joint bank accounts nowadays is that they create immediate possessory as well as survivorship rights.[14] To persist in clinging to ancient fictions created in most part to avoid the pitfalls emanating from the statute of wills to justify in some cases and to deny in others what the joint account with right of survivorship was truly intended to accomplish will simply perpetuate needless confusion. We should not subvert what is common understanding by wandering in bypaths of ancient logic.[15] A surviving named joint account holder should be entitled to obtain funds remaining on deposit in a joint account without the necessity of first having to travel through several court systems and to have lawyers, trial judges, juries, and appellate judges perform post mortem cerebral autopsies and examinations in order to determine and second-guess what the subjective intent of the deceased joint owner of the account was at the time the account was created. In enacting § 19–9–14, the General Assembly in 1995 commendably acted to rescue banks and financial institutions from the chaos rampant in the uncertainties of joint bank account problems by permitting those institutions, without any fear of penalty or liability, to pay out any funds remaining in a joint bank account to any named survivor on the particular joint account. We today rescue the remaining parties, the named account holders, from that same chaotic setting. As Justice Cardozo once said, "Precedents drawn from the days of travel by stage coach do not fit the conditions of travel today." *MacPherson v. Buick Motor Co.,* 217 N.Y. 382, 111 N.E. 1050, 1053 (1916). It is now time to adapt our law to the common understanding of those who establish joint bank accounts and to make the law predictable and reliable for those people.[16] Accordingly, we conclude

---

**14.** In fact, joint bank accounts are often referred to as a "poor man's will" because they are "[m]ost often \* \* \* employed by persons with small estates who believe that it is possible thus to effectuate a testamentary disposition without the expense of will drafting or the delay of probate." Note, *Disposition of Bank Accounts: The Poor Man's Will,* 53 Colum.L.Rev. 103, 103 (1953).

**15.** Paraphrasing Justice Holmes in *Ruddy v. Rossi,* 248 U.S. 104, 111, 39 S.Ct. 46, 48, 63 L.Ed. 148, 153 (1918).

**16.** *See, e.g.,* Charles Plotnick and Stephan Leimberg, *Keeping Your Money* (1987); Mary Randolph, *8 Ways to Avoid Probate* (1996). The Massachusetts Supreme Judicial Court in *Blanchette v. Blanchette,* 362 Mass. 518, 287 N.E.2d 459 (1972), came close to saying what we believe now to be the practical solution to the joint bank account muddle. "We recognize that under the cases cited the arrangement of the parties provides a substitute for a will. But we see no harm in that. 'If an owner of property can find a means of disposing of it inter vivos that will

that the opening of a joint bank account wherein survivorship rights are specifically provided for is conclusive evidence of the intention to transfer to the survivor an immediate *in praesenti* joint beneficial possessory ownership right in the balance of the account remaining after the death of the depositor, absent evidence of fraud, undue influence, duress, or lack of mental capacity. Likewise, if a joint bank account does not provide for survivorship rights, that absence will be conclusive evidence of an intent not to transfer any right of ownership to the survivor, absent evidence of mistake or fraud.

■ Returning to the facts of this case, we find it clear that all of the accounts in question were joint accounts with a right of survivorship in whoever survived. On the basis of the record facts before us, our opinion today clearly establishes the right of each of the surviving persons named on those accounts to the funds remaining in them upon the death of Florence A. Izzi on December 27, 1993.

We note in deference to the trial justice in this case that even though this opinion serves to overturn his decision, the trial justice had correctly followed and applied the controlling Rhode Island case law existing at the time of the trial. That relied upon case law precedent, however, is no longer of any precedential value in resolving disputes that may arise concerning ownership interests in joint bank accounts that provide for specific right of survivorship.

For all the foregoing reasons the defendants' appeals are sustained and the order of the trial justice is reversed. The papers in this case are remanded to the Superior Court for entry of judgment in accordance with this opinion.

render a will unnecessary for the accomplishment of his practical purposes, he has a right to employ it. The fact that the motive of a transfer is to obtain the practical advantages of a will without making one is immaterial.' *National Shawmut Bank of Boston v. Joy*, 315 Mass. 457, 471–472, 53 N.E.2d 113, 122, and cases cited." 287 N.E.2d at 463.