June 17, 2019

**Supreme Court**

No. 2017-56-Appeal.
(WP 14-93)
No. 2017-183-Appeal.
(WP 14-423)

Lizbeth A. Larkin, in her capacity as    :
Executrix of the Estate of Catherine I. Ryan

v.    :

Michaela Arthurs et al.    :

Michaela Arthurs et al.    :

v.    :

Lizbeth Larkin.    :

 NOTICE: This opinion is subject to formal revision before publication in the Rhode Island Reporter. Readers are requested to notify the Opinion Analyst, Supreme Court of Rhode Island, 250 Benefit Street, Providence, Rhode Island 02903, at Telephone 222-3258 of any typographical or other formal errors in order that corrections may be made before the opinion is published.

**Supreme Court**

No. 2017-56-Appeal.
(WP 14-93)
No. 2017-183-Appeal.
(WP 14-423)
(Concurrence and
Dissent begin on Page 17)

Lizbeth A. Larkin, in her capacity as          :
Executrix of the Estate of Catherine I. Ryan

v.                                                                :

Michaela Arthurs et al.                               :

Michaela Arthurs et al.                               :

v.                                                                :

Lizbeth Larkin.                                          :

Present:  Suttell, C.J., Goldberg, Flaherty, Robinson, and Indeglia, JJ.

## O P I N I O N

**Justice Robinson, for the Court.**  This contentious and regrettable family dispute revolves around the distribution of the assets of the parties' deceased mother, Catherine Ignatia Ryan.[1]  Two of Mrs. Ryan's children, Michaela Arthurs and Mark Ryan, appeal from the November 9, 2016 final judgments in two Washington County Superior Court actions that were treated in a consolidated manner in that court and are likewise being reviewed by us in a consolidated manner.  Before us are the Superior Court's rulings with respect to the substance of

---

[1]     The four children of Catherine Ryan are: Michaela Arthurs, Mark Ryan, Lizbeth Larkin, and Lisa Ryan.  We shall hereinafter sometimes refer to the members of the Ryan family by their first names.  We do so for the sake of clarity, and we intend no disrespect.

- 1 -

two orders of the Probate Court of the Town of South Kingstown.[2]  Those rulings of the Superior Court provided that: (1) as to two specific bank accounts at BankNewport, those accounts were not estate assets and should be distributed pursuant to paragraph three of Catherine's will—*i.e.*, one should be distributed to Lisa and the other to Lizbeth rather than being divided equally among all four of Catherine's children; and (2) there was no basis to remove Lizbeth as executrix of Catherine's estate.  Michaela and Mark timely appealed both judgments of the Superior Court to this Court.

For the reasons set forth in this opinion, we affirm both judgments of the Superior Court.

## I

## Facts and Travel

It is undisputed that Catherine died on January 14, 2013.  It is also undisputed that, at some point in 2012 after having sold her house, Catherine deposited the proceeds of the sale into an account at Washington Trust (the proceeds account).  It is undisputed that Catherine then drew upon the proceeds account by having two checks issued in her name in the amount of $50,000 each.  The parties further agree that, in October of 2012, those checks were deposited into two bank accounts at BankNewport, into each of which was deposited $50,000.  The first account indicates that its owners are "Catherine I. Ryan or Lizbeth Larkin."  The second account indicates that its owners are "Catherine I. Ryan or Lisa A. Ryan."  Neither account was specifically identified as being a joint account with right of survivorship (nor did either account contain any indication to the contrary).

---

[2]    The first appeal from the Probate Court was brought by Lizbeth (in her capacity as executrix of her mother's estate) in the Superior Court; it was assigned case No. WP-2014-0093, and it will hereinafter sometimes be referred to as "the distribution controversy."  The second appeal from the Probate Court was brought in the Superior Court by Michaela and Mark; it was assigned case No. WP-2014-0423, and it will hereinafter sometimes be referred to as "the removal controversy."

In early February of 2013, Lizbeth filed in the Probate Court a petition to probate Catherine's last will and testament. (Catherine's will had named Lizbeth as executrix.) When Lizbeth filed the universal inventory with the Probate Court, she did not make reference therein to the two BankNewport accounts.[3] Michaela and Mark then proceeded to file an objection to the inventory, contending that the two BankNewport accounts should have been included.

On July 25, 2013, the probate judge ordered Lizbeth to amend the inventory by including therein the two BankNewport accounts. Lizbeth did not appeal that order to the Superior Court, and she amended the inventory. Several months later, on February 5, 2014, the probate judge issued another order, which provided that the two accounts were part of what he termed as the "general inventory" of the estate. He then determined that the proceeds from those accounts should be distributed under paragraph six of Catherine's will, pursuant to which they would be distributed "in equal shares" among the four siblings. Lizbeth timely appealed the latter order to the Superior Court.

On March 19, 2014, Michaela and Mark filed what was titled a "renewed motion" in the Probate Court seeking to remove Lizbeth as executrix. On June 17, 2014, the probate judge issued an order denying that motion. Michaela and Mark then timely appealed that order to the Superior Court.

The two appeals from the Probate Court were consolidated, and a trial was held in the Superior Court on November 30, 2015. At the trial, Lizbeth testified that, in October of 2012, Catherine had been informed by her doctors "that she only had a matter of months to live." Lizbeth further testified that, on October 16, 2012, a few days after receiving what Catherine

---

[3]     It appears from the record that, at some point during the probate proceedings, the funds from the two BankNewport accounts were deposited into an account or accounts at Washington Trust. However, for ease of reference we refer to the disputed accounts as "the two BankNewport accounts."

referred to as her "death sentence," Catherine requested Lizbeth to drive her to an office of Washington Trust. It was Lizbeth's testimony that, at Washington Trust, Catherine asked that two $50,000 bank checks be made out to her from her account at that bank with the balance to remain in a Washington Trust account in her name. Lizbeth testified that, upon leaving Washington Trust, Catherine stated that the funds left in the Washington Trust account after the withdrawal of the two $50,000 checks "would be her probate." Lizbeth said that her mother then asked to be taken to an office of BankNewport and to have Lisa meet them there.

Lizbeth further testified that Lisa did meet them at BankNewport and that Catherine told a bank representative that she wanted to open one account for Lisa and another account for Lizbeth. Into each of those two accounts Catherine deposited one of the $50,000 Washington Trust checks. It was Lizbeth's further testimony that Catherine told her that "the probate was set up * * * and whatever was left [was] to be divided by four * * *."

Lisa also testified at trial. She stated that, at the time of the opening of the BankNewport accounts, Catherine told her that she wanted one of the accounts to belong to Lizbeth and one to Lisa.

There were several joint exhibits admitted into evidence at trial, including: Catherine's will; the deposition testimony of Lisa Sellar, a "retail banking administrator" in the employ of BankNewport; the deposition testimony of Paul Ragosta, the attorney who had advised Catherine concerning her will and drafted the will at issue; and a letter from Lizbeth to Michaela relative to Catherine's estate. Pertinent portions of those exhibits will be discussed hereinafter.

Several months later, on August 31, 2016, the trial justice issued a bench decision. He first addressed and then rejected the arguments of Michaela and Mark to the effect that the appeal should be rejected on "law of the case," *res judicata*, or "jurisdictional" grounds. He

- 4 -

proceeded to hold that, after considering the principles set forth in this Court's opinion in the case of *Robinson v. Delfino*, 710 A.2d 154 (R.I. 1998),[4] the absence of a designation on the two BankNewport accounts relative to the survivorship issue was, in his words, "the product of a mistake by the bank * * *."[5]  He further determined that that mistake allowed for the examination of extrinsic evidence as to Catherine's intent because "the Court can't go simply on the face of these two accounts * * *."  He then found that "the two accounts, although on their face [they] do not contain a designation of a right of survivorship * * * were accounts that were created with the right of survivorship."  The trial justice proceeded to hold that the two BankNewport accounts "should be distributed pursuant to the terms of paragraph 3 of the will * * *."  Accordingly, he concluded that each of the two BankNewport accounts should be distributed to Lisa and Lizbeth respectively as surviving owners and should not be divided among all four siblings equally pursuant to paragraph six of the will.

With respect to the second issue before him, the trial justice affirmed the Probate Court's decision not to remove Lizbeth as executrix because he found that there was no "ill or improper intent" on the part of Lizbeth and because he determined that she "appears to have been acting in accordance with what she understood her mother's wishes to be * * *."

---

[4]     Significantly, in the portion of his bench decision dealing with the holding in *Robinson v. Delfino*, 710 A.2d 154 (R.I. 1998), the trial justice quoted the basic rules set forth in that case relative to the survivorship issue in the context of joint accounts including the following important proviso: "[I]f a joint bank account does not provide for survivorship rights, that absence will be conclusive evidence of an intent not to transfer any right of ownership to the survivor, *absent evidence of mistake or fraud*." *Robinson*, 710 A.2d at 161 (emphasis added).

[5]     We describe in fuller detail in Part IV.A.3, *infra*, the factual findings and the credibility determinations that constitute the basis for the trial justice's conclusion that the absence of a designation as to the right of survivorship *vel non* was "the product of a mistake by the bank * * *."

Subsequently, on October 18, 2016, the Superior Court justice issued an order in the consolidated appeals. That order provided that the two accounts should be distributed to Lizbeth and Lisa and that there was no basis to remove Lizbeth as executrix; final judgments to that effect were entered for Lizbeth in the two cases on November 9, 2016.[6] Michaela and Mark appealed those final judgments to this Court.

## II

## Standards of Review

It is well established that a probate appeal to the Superior Court "is *de novo* in nature * * *." *Lett v. Giuliano*, 35 A.3d 870, 876 (R.I. 2012); *see* G.L. 1956 § 33-23-1(b) ("An appeal under this chapter is not an appeal on error but is to be heard de novo in the superior court.").

It is a fundamental principle of our appellate jurisprudence that "the factual findings of a trial justice sitting without a jury are accorded great weight and will not be disturbed unless the record shows that the findings clearly are wrong or the trial justice overlooked or misconceived material evidence." *In re Estate of Ross*, 131 A.3d 158, 166 (R.I. 2016) (internal quotation marks omitted); *see B.S. International Ltd. v. JMAM, LLC*, 13 A.3d 1057, 1062 (R.I. 2011); *Bielecki v. Boissel*, 715 A.2d 571, 575 (R.I. 1998). If, in our review of the record, "it becomes clear to us that the record indicates that competent evidence supports the trial justice's findings, we shall not substitute our view of the evidence for [that of the trial justice] even though a

---

[6] For the sake of clarity, we think it helpful to quote the Superior Court's judgment with respect to the distribution controversy:

> "The two bank accounts * * * which are the subject matter of this litigation, in the name of the decedent Catherine Ryan and Lisa Ryan and the decedent Catherine Ryan and Lizbeth Larkin are not estate assets and should be distributed pursuant to the terms of Paragraph 3 of the Will to the survivors, namely Lisa Ryan and Lizbeth Larkin."

- 6 -

contrary conclusion could have been reached." *In re Estate of Ross*, 131 A.3d at 166 (internal quotation marks omitted).

Similarly, "[w]e accord great weight to a trial justice's determinations of credibility, which, inherently, are the functions of the trial court and not the functions of the appellate court." *JPL Livery Services, Inc. v. Rhode Island Department of Administration*, 88 A.3d 1134, 1142 (R.I. 2014) (internal quotation marks omitted); *see Rodriques v. Santos*, 466 A.2d 306, 309 (R.I. 1983) ("On appeal we do not consider arguments that certain evidence is more credible than other evidence. That is a function of the trial court.").

Additionally, it should be borne in mind that, "[w]hen interpreting the language of a will, * * * we proceed on a *de novo* basis, just as we do when we interpret the language in contracts." *Lazarus v. Sherman*, 10 A.3d 456, 462 (R.I. 2011) (internal quotation marks omitted). "This Court's primary objective when construing language in a will or trust is to ascertain and effectuate the intent of the testator or settlor as long as that intent is not contrary to law." *Steinhof v. Murphy*, 991 A.2d 1028, 1033 (R.I. 2010) (internal quotation marks omitted).

### III

### Issues on Appeal

On appeal, Michaela and Mark contend, with respect to the distribution controversy, that the trial justice: (1) acted without jurisdiction to review an "unappealed" order of the Probate Court; (2) improperly allowed hearsay testimony at trial; (3) erroneously determined that there had been a mistake regarding the opening of the two BankNewport accounts; (4) erred in his ruling relative to the distribution of the two BankNewport accounts; and (5) improperly considered extrinsic evidence when interpreting the will. As for the removal controversy,

Michaela and Mark contend that the trial justice erroneously affirmed the Probate Court's denial of their motion to remove Lizbeth as executrix.

## IV

## Analysis

## A

### The Distribution Controversy

### 1. The Alleged Lack of Jurisdiction

Michaela and Mark argue at the outset that, because Lizbeth did not appeal the July 25, 2013 Probate Court order directing her to amend the universal inventory so as to include the two BankNewport accounts, "the Superior Court lacked jurisdiction" to consider the question of whether those accounts included a right of survivorship. However, after careful deliberation, we find that argument to be unavailing. We find ourselves to be wholly in agreement with the trial justice's specific determination that the question of whether the accounts were joint with right of survivorship "was not finally adjudicated *until February 5th, 2014*" and that, therefore, that issue was properly before the Superior Court in view of the fact that Lizbeth did timely appeal the February 5, 2014 order.[7] (Emphasis added.)

---

[7]    The trenchant analysis by the trial justice relative to this threshold issue deserves to be quoted *in extenso*:

> "It also appears from the order of February 5th, 2014 that the issue may have only been partially resolved by the Probate Court but that it was a two-part analysis. It was an analysis of whether to put it in the inventory, and then once it was in the inventory how it was to be addressed pursuant to the will. And if there were an appeal to have been taken prior to that, then it would have been a piece-meal process which would have either bounced back to the Probate Court or not bounced back to the Probate Court.

The first order (issued on July 25, 2013) made no definitive ruling as to the nature of the accounts; it was in actuality no more than a pragmatic and ministerial determination by the probate judge to the effect that it would be best to gather all potential estate assets under one roof until such time as he had occasion to grapple with the challenging legal issue of distribution. The order regarding the BankNewport accounts simply gathered Catherine's assets together so that an orderly administration could take place—as eventually happened; it was in the nature of "housekeeping" and was not amenable to review by a justice of the Superior Court. It was only the second order (issued on February 5, 2014) that substantively addressed the distribution controversy. The probate judge in the second order stated that the matter was "presented for resolution," and he ordered that the proceeds of the accounts "be disbursed in keeping with Paragraph Sixth of the will," with which ruling Lizbeth took issue by appealing to the Superior Court.

It is our view that an appeal to the Superior Court at the time of the issuance of the first order was certainly not required. Actually, an appeal at that time would have had absolutely no meaningful effect because the vitally important legal issue concerning the distribution of Catherine's assets under the will had not yet been decided. In other words, at that point in time

"So under the circumstances of this case, the Court does find that to the extent that there was a ruling made by the Probate Court in July of 2013 to place the accounts in the inventory, *it was not finally adjudicated until February 5th, 2014*, where the Court at that time made, again, specific reference in its order to the *Robinson vs. DelFino* [*sic*] case and made a determination that it did make." (Emphasis added.)

- 9 -

(July 25, 2013), an appeal would have been a vain act[8] because it would have failed to present a sufficiently developed issue for the Superior Court to review.

For these reasons, we are unpersuaded by the jurisdictional argument presented by Michaela and Mark.

### 2. The Hearsay Issue

Michaela and Mark have also argued that the trial justice erred in "allow[ing] the introduction of voluminous hearsay testimony." The testimony with which they take issue and which was objected to at trial is Lizbeth's recounting of conversations with her mother shortly before the latter's death. The contested statements by Catherine were purportedly made at the time of the opening of the bank accounts, and we have adequately summarized those statements in the Facts and Travel section of this opinion. The statements attributed to Catherine were objected to on hearsay grounds, but the trial justice overruled those objections without articulating his reason for so ruling.[9]

We need not resolve in this case that particular evidentiary issue because it is our view that, even if the statements purportedly made by Catherine were erroneously admitted into evidence, such an evidentiary error in the context of the bench trial under review would constitute harmless error and would not be a basis for reversal. *See Now Courier, LLC v. Better*

---

[8]    *See Guilford v. Mason*, 22 R.I. 422, 430, 48 A. 386, 388 (1901) (recognizing "[t]he maxim that the law does not compel one to do vain or useless things"); *cf. El Dia, Inc. v. Hernandez Colon*, 963 F.2d 488, 498 (1st Cir. 1992) ("[E]quity will not require a useless thing, or insist upon an idle formality.") (quoting *Stewart v. United States*, 327 F.2d 201, 203 (10th Cir. 1964)).

[9]    "Whether evidence falls within an exception to the hearsay rule is a question that is addressed to the sound discretion of the trial justice." *Martin v. Lawrence*, 79 A.3d 1275, 1281 (R.I. 2013). As such, "this Court will not disturb a ruling in that respect unless it is clearly erroneous." *Id.*

*Carrier Corp.*, 965 A.2d 429, 435 (R.I. 2009) (noting that this Court has previously held that "the admission of hearsay is harmless when the record demonstrates that it is merely cumulative of proper evidence"); *see also Flanagan v. Wesselhoeft*, 765 A.2d 1203, 1211 (R.I. 2001); *Nugent v. City of East Providence*, 103 R.I. 518, 528, 238 A.2d 758, 764 (1968) ("It is well settled that such [inadmissible] evidence is prejudicial only when it reasonably appears that the irrelevant evidence so influenced the judgment of the trial justice as to have caused him to rest his decision in whole or substantial part on that evidence."); *see generally Bradley v. Sugarbaker*, 891 F.3d 29, 37 (1st Cir. 2018).

Completely apart from the statements purportedly made by Catherine that are challenged as being inadmissible hearsay, there was other, rock solid evidence in the record to support the trial justice's finding of mistake—namely, the crucial, unrebutted deposition testimony of Lisa Sellar,[11] the Retail Banking Administrator from BankNewport who testified as to its being the policy of BankNewport to open joint accounts "only" if they are of the right-of-survivorship variety. What is more, the testimony of Ms. Sellar was buttressed by the deposition testimony of Attorney Paul Ragosta, who testified as to the legal advice that he had provided to Catherine regarding "the distinction between probate assets and nonprobate assets."

For these reasons, we perceive no basis for reversing the trial justice on evidentiary grounds, even conceding *arguendo* that he erred with respect to the hearsay issue.

---

[11] It should be noted that, unlike what might be contended as to the motivation of Lizbeth and Lisa, there is absolutely no basis in the record for concluding that Ms. Sellar was anything more than a completely disinterested and qualified witness—a bank administrator testifying as to her bank's consistent policy. To employ a graphic but cogent metaphor, Ms. Sellar had no dog in the fight.

**3. The Trial Justice's Finding of Mistake**

Michaela and Mark next argue that the trial justice erred with respect to the issue of "mistake." (It will be recalled that the trial justice found that the fact that the boxes on the BankNewport joint account cards that indicate whether or not a joint account is with right of survivorship were left blank was "the product of a mistake by the bank," and that, therefore, the exception for "mistake" that was expressly established by this Court in *Robinson v. Delfino*, 710 A.2d 154 (R.I. 1998), was applicable. *See Robinson*, 710 A.2d at 161; *see also* footnote 4, *supra*.)

It is important to bear in mind that, in *Robinson*, this Court set forth the following principle that is applicable to the analysis of joint accounts that on their face are not explicit as to right of survivorship: "[I]f a joint bank account does not provide for survivorship rights, that absence will be conclusive evidence of an intent not to transfer any right of ownership to the survivor, *absent evidence of mistake* or fraud." *Robinson*, 710 A.2d at 161 (emphasis added). Even though the evident goal of the Court in *Robinson* was to create a presumption as to there being no survivorship rights unless the joint account so indicates, the Court in that case expressly allowed for that presumption being rebutted by "evidence of mistake." *Id.*

Having explicitly noted the exception in *Robinson* for "mistake," the trial justice first observed that "clearly, the bank accounts don't have any of the boxes [as to survivorship *vel non*] checked." Given the applicability of the *Robinson* exception for mistake, the trial justice was free to look to extrinsic evidence in order to determine whether Catherine intended that the two joint accounts at BankNewport be considered to be joint accounts *with* right of survivorship. He then proceeded to consider the deposition testimony of Lisa Sellar, an employee of BankNewport whose title was Retail Bank Administrator. In that deposition, Ms. Sellar testified that

BankNewport "open[s] joint accounts with rights of survivorship only."[12]  The trial justice also considered the deposition of Paul Ragosta, the attorney who had assisted Catherine in connection with the will at issue.  He noted that Attorney Ragosta "testified that [Catherine] was aware of the distinction that paragraph 3 [of her will] would essentially be assets that were not part of the probate estate and that paragraph 6 would be assets that were part of the probate estate."[13]  The trial justice then made the explicit finding that "the two accounts, although on their face do not contain a designation of a right of survivorship, they were accounts that were created with the right of survivorship."

The issue of mistake is factual in nature.  *See McEntee v. Davis*, 861 A.2d 459, 464 (R.I. 2004) (stating that the Court could not "conclude that the trial justice committed reversible error in making a factual determination of unilateral mistake").  Accordingly, we see no basis in the record for overturning the trial justice's finding of mistake since, as was summarized in the immediately preceding paragraph, there was more than sufficient competent evidence to support that finding.  *See In re Estate of Ross*, 131 A.3d at 166.

**4. The Distribution of the Accounts Under Paragraph Three of the Will**

Michaela and Mark next argue that the bank accounts should be distributed pursuant to paragraph six of Catherine's will—not pursuant to paragraph three, as the trial justice ruled. Paragraph three of Catherine's will states, in pertinent part:

> "In the event that at the time of my death I am joint owner,
> co-owner or owner of any * * * bank account * * * which is

---

[12]  Ms. Sellar was cross-examined as to BankNewport's policy with respect to joint accounts, and her testimony remained the same.

[13]  While there was also testimony by Lizbeth and Lisa concerning statements purportedly made by Catherine about the survivorship issue, we deliberately abstain from factoring those statements into our analysis of the sufficiency of the factual basis for the trial justice's finding of mistake.  *See* Part IV.A.2, *supra*.

- 13 -

registered or issued in my name and that of any other person or persons as tenants by the entirety or *as joint tenants with right of survivorship*, or which in any way appears to be payable to either co-owner or a named beneficiary on my death, I give, devise and bequeath, absolutely and forever in fee simple and free of trust, all my right, title and interest in any such property to the surviving joint owner or co-owner thereof, or to the survivor apparently entitled thereto upon my death." (Emphasis added.)

The relevant portion of paragraph six of the will states that, in the event Catherine were to be predeceased by her husband (as did happen), Catherine would: "give, devise and bequeath all the rest, residue and remainder of my estate in equal shares to my children * * * if they survive me * * *."

"When interpreting the language of a will, * * * we proceed on a *de novo* basis, just as we do when we interpret the language in contracts." *Hayden v. Hayden*, 925 A.2d 947, 950 (R.I. 2007); *see also Lazarus*, 10 A.3d at 462. By the plain and ordinary meaning of the above-quoted paragraph three of the will, the trial justice correctly held that the joint accounts with right of survivorship at issue (*i.e.*, the two previously described BankNewport accounts) should be distributed pursuant to paragraph three to "the surviving joint owner[s]"—*viz.*, Lizbeth and Lisa.

Because the accounts at issue were joint accounts with right of survivorship, the trial justice properly determined that they should be distributed to Lizbeth and Lisa through paragraph three of their mother's will and not through paragraph six, which deals with "the rest, residue and remainder" of Catherine's estate.[14]

---

[14] The trial justice also stated that the two accounts "are not estate assets" and that they might also fall under the umbrella of accounts distributed under paragraph three by nature of "appear[ing] to be payable to either co-owner or a named beneficiary on my death." Because this Court has determined that the trial justice properly decided that the accounts should be distributed under paragraph three as joint accounts with right of survivorship, we need not address these statements by the trial justice. *See Furlan v. Farrar*, 982 A.2d 581, 585 (R.I. 2009); *see also Summit Insurance Co. v. Stricklett*, 199 A.3d 523, 533 (R.I. 2019); *see generally PDK Laboratories Inc. v. United States Drug Enforcement Administration*, 362 F.3d 786, 799 (D.C. Cir. 2004) (John Roberts, J., concurring in part and concurring in the judgment) ("[T]he

- 14 -

**5. The Trial Justice's Consideration of Extrinsic Evidence to Interpret the Will**

Michaela and Mark also argue that what they contend was the trial justice's consideration of extrinsic evidence to interpret Catherine's will was "improper and erroneous" because, they allege, the language of the will was unambiguous.

It is a well-established "principle that parol or extrinsic evidence cannot be used to vary the unambiguous terms of a will." *Greater Providence Chapter, R.I. Association of Retarded Citizens v. John E. Fogarty Foundation for the Mentally Retarded*, 488 A.2d 1228, 1229 (R.I. 1985). However, contrary to the assertions of Michaela and Mark, it is our definite opinion that that principle was not violated in this case. The trial justice specifically stated that he did "not find that there's any reason to look at parole evidence for review of the third paragraph." When, in the course of deciding this difficult case, the trial justice did look to extrinsic evidence (*e.g.*, the testimony of Ms. Sellar and of Attorney Ragosta), he did so while addressing the survivorship issue with respect to "the bank accounts"—*not* while interpreting the will.

The parties agree that the will is unambiguous, and it is clear that the trial justice treated it as such. As previously indicated, the trial justice properly considered extrinsic evidence to determine the nature of the bank accounts at issue, and he then ruled that those accounts (which he had held were joint accounts with right of survivorship) were to be distributed, pursuant to the plain and unambiguous language of paragraph three, to Lizbeth and Lisa respectively.

**B**

**The Removal Controversy**

Michaela and Mark also contend that the trial justice erred when he affirmed the Probate Court's denial of their motion seeking to remove Lizbeth as the executrix of their mother's

cardinal principle of judicial restraint" is that "if it is not necessary to decide more, it is necessary not to decide more * * *.").

estate. They aver that she should have been removed because she has an "obvious, continuing and intractable conflict of interest" and that she has failed to meet her fiduciary duty as executrix, in view of her purported "refusal to marshal, assemble and collect the assets of the Estate" and "claim[ing] them as her own." They additionally argue that a letter from Lizbeth to Michaela concerning a particular mink coat was part of "overwhelming and incontrovertible evidence" of a level of hostility that rendered her unsuitable as executrix.

This Court gives deference to a lower court's decision on removing executors. *See Andrews v. Carr*, 2 R.I. 117, 118 (1852) ("This [C]ourt is careful in reversing the decrees of the Court of Probate in removing or appointing administrators, because from its position that court can better judge who is the suitable person for the office."). We have further expressly held that "the mere fact that one has a claim against an estate is not a disqualification for the office [of executor] * * *." *Murray v. Angell*, 16 R.I. 692, 693, 19 A. 246, 246 (1890).

The trial justice reviewed the evidence and arguments presented by Michaela and Mark relative to Lizbeth's alleged unsuitability (*viz.*, her actions regarding the two bank accounts and the letter to Michaela about a certain mink coat). He held that Lizbeth "appears to have been acting in accordance with what she understood her mother's wishes to be, and, more particular, what she understood to be the impact of" the BankNewport accounts. He additionally stated that the letter about the mink coat did not support "any basis for removing Ms. Larkin."

After a careful review of the record, we perceive no basis for holding that the trial justice erred in determining that the evidence presented was not sufficient to require Lizbeth's removal as executrix. Therefore, we affirm his decision with respect to the removal controversy.

## V

## Conclusion

For the reasons set forth herein, we affirm both judgments of the Superior Court. We remand the record to that tribunal.


**Justice Goldberg, concurring in part and dissenting in part.** I concur in that part of the majority opinion that holds that the issue regarding the status of the BankNewport accounts was not finally adjudicated until February 5, 2014, and, therefore, the appeal was properly before the Superior Court. I also concur with the majority's holding that the trial justice did not err in affirming the Probate Court's denial of the motion to remove Lizbeth Larkin as executrix. However, I part company with the conclusions reached by the majority concerning the two BankNewport accounts. It is my opinion that the trial justice committed reversible error in reaching the conclusion that the accounts were joint accounts with the right of survivorship, and that he strayed far afield from this Court's venerable opinion in *Robinson v. Delfino*, 710 A.2d 154 (R.I. 1998). It is also my opinion that any suggestion of mistake in the opening of joint bank accounts that do not contain a right-of-survivorship designation should not serve as an open invitation for the presentation of hearsay testimony in order to perform a postmortem cerebral autopsy, the very type "of foray into the mind of a deceased person" that *Robinson* was intended to eliminate. *McManus v. McManus*, 18 A.3d 550, 553-54 (R.I. 2011). Finally, because we have held steadfast to *Robinson*'s landmark holding that, when confronted with a joint bank account that "does not provide for survivorship rights, that absence will be conclusive evidence of an intent not to transfer any right of ownership to the survivor" in the absence of mistake, the party alleging mistake bears a high burden of proof; a mistake must be established by clear and

- 17 -

convincing evidence. *Robinson*, 710 A.2d at 161. Consequently, I dissent. This case should be remanded for a new trial.

**Hearsay**

It is my opinion that the Superior Court abused its discretion, thereby committing reversible error, in allowing hearsay testimony and then relying on that hearsay to determine Catherine's intent at the time the BankNewport accounts were opened. Over continuous appropriate hearsay objections from Michaela and Mark's attorney, the trial justice admitted a significant amount of hearsay testimony from Lizbeth and Lisa regarding Catherine's intent when opening the BankNewport accounts. The Superior Court justice then anchored his ultimate decision to this inadmissible evidence. This not only violated our rules of evidence, but its unfettered admission into evidence lands us right back in the pre-*Robinson* era.

Specifically, the trial justice relied on hearsay testimony to determine two issues in this case—first, that there was a "mistake" on the part of the bank in not requiring Catherine to designate the type of account, and, then, to find that it was Catherine's intent to create two joint accounts with the right of survivorship. The Superior Court justice found that "[t]he testimony of Ms. Larkin and Ms. Ryan, that is completely un-rebutted, clearly establishes for the Court that it was Ms. Ryan's intent on October 16, 2012 to create two accounts for the benefit of her two daughters." The trial justice's decision in this case rested upon Lizbeth's testimony that "[Catherine] told [Lizbeth] that she wanted to open two accounts, that one was for Lisa Ryan and one was for Lizbeth Larkin; and [Catherine] told Ms. Larkin that, quote, 'I want you and Lisa to have the money.'" The trial justice also found that when Catherine received her "death sentence," Lizbeth accompanied her to Washington Trust, where she withdrew funds in two checks; she allegedly told "Ms. Larkin that the assets that were remaining at Washington Trust

- 18 -

were her probate[.]" The Superior Court justice also based his decision upon the impermissible hearsay testimony of Lisa when he noted that "Lisa Ryan testified to the same effect, that her mother told her that she wanted her to have the money."

As hearsay, the testimony of Lizbeth and Lisa—who stood to benefit from this evidence—was not competent to support the Superior Court's decision to reform those accounts. Critically, this evidence was self-serving and inadmissible to show Catherine's state of mind and intent at the time the joint deposits were opened.

Moreover, the majority's fallback position that "there was other, rock solid evidence in the record to support the trial justice's finding of mistake" is misplaced. First, the majority fails to point to that evidence. Second, it is not the function of this Court to redact the testimony of Lizbeth and Lisa to patch together a result. Third, such an exercise ignores the fact that the trial justice based his decision on their impermissible hearsay statements and a new trial should be ordered in this case.

### Joint Accounts with the Right of Survivorship

This Court's 1998 opinion in *Robinson* was a sweeping decision intended to settle, once and for all, the thorny question of joint accounts with and without the right of survivorship. The Court promulgated a bright-line groundbreaking rule:

> "[T]he opening of a joint bank account wherein survivorship rights are specifically provided for is conclusive evidence of the intention to transfer to the survivor an immediate *in praeseti* joint beneficial possessory ownership right in the balance of the account remaining after the death of the depositor, absent evidence of fraud, undue influence, duress, or lack of mental capacity. Likewise, if a joint bank account does not provide for survivorship rights, that absence will be *conclusive evidence* of an intent not to transfer any right of ownership to the survivor, absent evidence of mistake or fraud." *Robinson*, 710 A.2d at 161 (emphasis added).

In adopting this approach, all of the Court's analytical emphasis was placed on the account agreement itself, and not the subjective intent of the deceased joint owner of the account. Essentially, the account agreement is considered an integrated contract, and evidence of the owner's subjective intent is not permitted. The goal of the Court in deciding *Robinson* was to avoid a requirement that "lawyers, trial judges, juries, and appellate judges perform post mortem cerebral autopsies * * * to determine and second-guess what the subjective intent of the deceased joint owner of the account was at the time the account was created." *Id.* at 160. It should not lightly be set aside. The exceptions recognized by this Court, fraud and mistake, should be construed narrowly, particularly mistake, given its broad potential for abuse in a he said/she said scenario.

Significantly, in *McManus*, this Court recognized the importance of *Robinson* when we noted that, "[b]y abandoning the formerly unpredictable and inconsistent approach [to right-of-survivorship battles], we sought to avoid situations whereby 'lawyers, trial judges, juries, and appellate judges perform post mortem cerebral autopsies and examinations in order to determine and second-guess what the subjective intent of the deceased joint owner of the account was at the time the account was created.'" *McManus*, 18 A.3d at 553 (quoting *Robinson*, 710 A.2d at 160). We also cautioned against "[a]n inquiry into whether the signature card and [bank disclosure documents] may be interpreted together to create a survivorship right, an inquiry the petitioner urges upon us, would be exactly the type of foray into the mind of a deceased person that our holdings in *Robinson* and *Gaspar*[ *v. Cordeiro*, 843 A.2d 479 (R.I. 2004),] sought to foreclose." *Id.* at 553-54. In this case, the sisters engaged in just such an inquiry.

First, Lizbeth and Lisa attempted to prove a mistake on the part of the bank when Catherine opened the joint accounts by pointing to the fact that there was no designation of the

type of account the owner intended. Having demonstrated that none of the four choices available to Catherine was selected, they then sought to prove that Catherine intended that the joint accounts created an immediate beneficial ownership in the accounts in Lizbeth and Lisa, with the right of survivorship. It is this second inquiry with which I quarrel. Not only did it rest on rank, inadmissible hearsay evidence that was relied upon by the trial justice, there was a bloody, postmortem cerebral autopsy in an effort to establish the subjective intent of the now-deceased Catherine. This unseemly foray into the mind of the decedent resurrected past estrangements and finger-pointing concerning which sibling(s) received assets from the parent prior to her death; all supplied by the very witnesses who stood to gain the most.

To be sure, we are not confronted with a scrivener's error or other clerical mistake in this case—errors which, I suggest, fall within the limited class of errors that *Robinson* anticipated. Although it is clear that the accounts were opened without providing for survivorship rights and the multiple choices set forth in the box on the form entitled "Ownership of Account—Consumer Purpose" were left blank, it should be noted that there were *four* choices in that box: "Individual"; "Joint - with Survivorship"; "Joint - No Survivorship"; and "Trust - Separate Agreement." There is no evidence that the bank and Catherine engaged in any discussion about survivorship rights. The trial justice filled in the blanks, and, despite the fact that an account without a survivorship designation is conclusive evidence of the owner's intent not to transfer any right of ownership, absent a mistake, there was no ruling on the burden of proof to overcome this conclusive evidence in order to establish mistake. Nowhere in the majority opinion is this addressed.

Nonetheless, in the first case to come before the Court in which a party, alleging mistake, seeks to overcome the conclusive presumption that an account owner did not intend to transfer

ownership rights to the survivor in an account that fails to provide for survivorship rights, a finding of unilateral mistake on the part of the bank (as opposed to a verifiable mutual material mistake by the account owner and the bank) does not resolve the dispute because it leads us back to the pre-*Robinson* days.

### *Robinson v. Delfino*

Lastly, I disagree with the majority's conclusion that there was more-than-sufficient competent evidence to support the trial justice's finding that "the fact that the boxes on the BankNewport joint account cards that indicate whether or not a joint account is with right of survivorship were left blank was 'the product of a mistake by the bank,' and that, therefore, the exception for 'mistake' that was expressly established by this Court in *Robinson* * * * was applicable." The majority acknowledges that "the evident goal of the Court in *Robinson* was to create a presumption as to there being no survivorship rights unless the joint account so indicates"; the majority goes on to hold that, once the trial justice noted the bank's unilateral mistake—the only mistake before him—the trial justice was then "free to look to extrinsic evidence in order to determine whether Catherine intended that the two joint accounts at BankNewport be considered to be joint accounts *with* right of survivorship." (Emphasis in original.) This amounts to the reformation of a bank account based on a unilateral mistake with no requirement of proof by clear and convincing evidence. In my opinion, this is a marked departure from *Robinson*, *McManus*, and *Gaspar*, and reopens the cerebral autopsy suite for estate fights. Although the trial justice may have been free to look to (admissible) extrinsic evidence in order to determine whether a mistake was made, an open foray into the ailing Catherine's intent was erroneous, and nothing in *Robinson* supports this conclusion. This was not an inquiry into whether there was a mistake by the bank, it was "the introduction of all

manner of extrinsic evidence [in order] to analyze the depositor's subjective intent," which *Robinson* expressly disallowed. *See Robinson*, 710 A.2d at 160.

Furthermore, the only evidence of mistake in this case is that the bank failed to adhere to a policy of checking off an appropriate box on the signature card. As noted, there was no testimony that Catherine asked the bank about the right of survivorship in the accounts, before this gigantic leap back to the pre-*Robinson* frontier. I simply am not convinced that the bank's failure to follow a purported policy of checking boxes on the signature cards opens the door to extrinsic evidence of the account owner's subjective intent in order to overcome the conclusive presumption set forth in *Robinson*. If the door does open, it should require proof by clear and convincing evidence. *See McEntee v. Davis*, 861 A.2d 459, 465 (R.I. 2004); *Hopkins v. Equitable Life Assurance Society of United States*, 107 R.I. 679, 685, 270 A.2d 915, 918 (1970).

The judgment in this case should be vacated and the case remanded for a new trial. Consequently, I dissent.

# STATE OF RHODE ISLAND AND PROVIDENCE PLANTATIONS

## SUPREME COURT – CLERK'S OFFICE

## OPINION COVER SHEET

| | |
|---|---|
| **Title of Case** | Lizbeth A. Larkin, in her capacity as Executrix of the Estate of Catherine I. Ryan v. Michaela Arthurs et al. <br><br> Michaela Arthurs et al. v. Lizbeth Larkin. |
| **Case Number** | No. 2017-56-Appeal. <br> (WP 14-93) <br><br> No. 2017-183-Appeal. <br> (WP 14-423) |
| **Date Opinion Filed** | June 17, 2019 |
| **Justices** | Suttell, C.J., Goldberg, Flaherty, Robinson, and Indeglia, JJ. |
| **Written By** | Associate Justice William P. Robinson III |
| **Source of Appeal** | Washington County Superior Court |
| **Judicial Officer From Lower Court** | Associate Justice Luis M. Matos |
| **Attorney(s) on Appeal** | For Plaintiff: <br><br> Kevin M. Daley, Esq. <br> Marvin H. Hormonoff, Esq. |
| | For Defendant: <br><br> Michael T. Eskey, Esq. <br> Stephen A. Izzi, Esq. |